1998 SD 84

SOUTH DAKOTA EDUCATION ASSOCI-ATION/ NEA, By and Through its President, Elaine ROBERTS; and South Dakota Education Association Council On Higher Education, By and Through its President James Zeman; Lona Lewis; Barb Peterson; Jerry Sweeney; Lela Holcomb; Henry Linares; David Boyles; Kathleen Parrow; Julie Smith; Curtis Olson; Diane Kummer; And Robert Stevens, Petitioners,

v.

Mark BARNETT, Attorney General of South Dakota in his Official Capacity; The South Dakota Board of Regents; and Robert T. Tad Perry, its Executive Director, Respondents.

No. 20499.

Supreme Court of South Dakota.

Argued June 3, 1998.

Decided July 29, 1998.

Linda Lea M. Viken of Viken, Viken, Pechota, Leach & Dewell, Rapid City, for petitioners.

Mark Barnett, Attorney General, Jeffrey P. Hallem, Assistant Attorney General, James F. Shekleton, General Counsel, Pierre, for respondents.

MILLER, Chief Justice.

[¶ 1.] The South Dakota Education Association and its Council on Higher Education (COHE) challenge the constitutionality of the general appropriations bill adopted by the 1998 Legislature. They seek a peremptory writ of prohibition ordering the South Dakota Board of Regents to cease implementing portions of the 1998 appropriations bill concerning salary increases for certain Regents' employees.

## FACTS

[¶ 2.] COHE is an affiliate of the South Dakota Education Association. Its membership consists of certain public employees who teach at the State's universities and other special schools under the Regents' control. COHE is the recognized bargaining representative for these educators under South Dakota's public employee collective bargaining law. *See* SDCL ch. 3–18.

[¶ 3.] While COHE asserts it annually enters into collective bargaining with the Regents, the Regents outline a more detailed history of the relationship. The Regents assert a multi-year master agreement with COHE expired on June 30, 1996 and that since that time the two entities have continued to bargain collectively in pursuit of a new agreement. Both COHE and the Regents agree that, after an impasse in the spring of 1997, the Regents unilaterally imposed interim terms and conditions of employment consisting of terms from both the expired agreement and the Regents' last best offer. While the Regents concede most of these interim terms remain in effect, they assert those concerning the distribution of salary increases do not. In that regard, the Regents contend they· reached a limited agreement with COHE governing distribution of salary increases for fiscal year 1998, but that the agreement was not intended to apply to moneys appropriated for salary increases for fiscal year 1999. The Regents affirmatively assert that before the 1998 legislative session they resumed active negotiations with COHE on distribution of salary increases for fiscal year 1999, but that no agreement or understanding in that regard was reached.

[¶ 4.] During the 1998 legislative session, the Legislature passed Senate Bill 242 (SB 242), the general appropriations bill. The bill contained an appropriation for salary increases for the Regents' employees.[1] Section 31 of SB 242 provides:

It is the intent of this Act that the distribution of salary increases to non-CSA employees[2] of the Board of Regents be made in a manner to be determined at the sole discretion of the Board of Regents, any other provisions of chapter 3–18 notwithstanding. (footnote added).

[¶ 5.] After passage of the appropriations bill, the Regents apparently took the position they were not required to engage in any further negotiations with COHE on the issue of distribution of salary increases. The agenda for a Regents' meeting in late March 1998 reflects this view:

Through language incorporated in the general appropriations bill, the Legislature directed that "the distribution of salary increases to non-CSA employees of the Board of Regents be made in a manner to be determined at the sole discretion of the Board of Regents." Through this language, the Legislature mandated that general fund appropriated dollars, tuition, other and federal funded dollars authorized through the appropriations bill should not be subject to the state's other laws governing state employee collective bargaining. The Legislature's intent was that the salary increases awarded to the Board's faculty and non-faculty exempt employees should be made based on market conditions, merit and performance. *Normally, the Board would be constrained by South Dakota's collective bargaining laws and would be required to engage in negotiations with the Board's faculty union, the Council of Higher Education (COHE), before distributing unit faculty salary increases. The Board's General Counsel,*

*Dr. Shekleton, advises that this language frees the Board from that requirement.*

\* \* \* \* \* \*

In its May meeting, the Board has traditionally acted on each campus' recommended faculty and non-faculty exempt salary increases. The campuses will soon begin their internal reviews, market comparisons, and compiling their recommendations. To assist the campuses in that process, to provide guidance, and to ensure that the Board of Regents system allocates those increases consistent with the intent of the Legislature, the Executive Director recommends that the Board provide firm guidelines to the campuses as to how they are to construct their recommended increases. A recommended set of guidelines can be found in Attachment I. (emphasis added).

Attached to the March meeting agenda was a set of comprehensive guidelines for distribution of salary increases based upon market conditions and employee merit. COHE's president alleges that when he requested that the Regents come to the table and negotiate on salaries, it refused to do so based upon the new language of the 1998 appropriations bill and the above interpretation thereof.

[¶ 6.] As the dispute over the negotiability of salary increases went unresolved, the time for the Regents' May meeting approached. The Regents' normal practice at the May meeting is to offer individual contracts to their instructors who then normally have only twenty days to sign and return the contracts or lose their employment. COHE expected the Regents to offer individual contracts at the May meeting with salaries and raises unilaterally established according to the guidelines adopted pursuant to the new language in the 1998 appropriations bill. Accordingly, COHE sought this Court's writ of prohibition to prevent the Regents from im-

---

1. While the parties have expended much effort in outlining the history of a Regents' plan for improving salaries at its educational institutions and in explaining the various funding sources for these salary improvements, we do not perceive these details as particularly relevant in resolving the issues presented in this case. For purposes of our analysis, it is sufficient to state that the Legislature appropriated money for salary increases for the Regents' employees.

2. "Non–CSA employees" refers to non-Career Service Act employees. In general, this includes faculty members and the Regents' professional administrative staff.

plementing the new legislation through issuance of individual teaching contracts. The requested writ was grounded on numerous issues alleging the invalidity of the new legislation. This Court granted an alternative writ and set a briefing schedule and date for oral argument why the alternative writ should not be made peremptory. In the interim, the parties stipulated to our entry of an order permitting the Regents to issue contracts based upon current salaries, terms and conditions of employment subject to our final decision in this matter.

## ISSUE ONE

[¶ 7.] **Does this Court have jurisdiction to issue the writ?**

 [¶ 8.] "A writ of prohibition is an extraordinary remedy," *South Dakota Bd. of Regents v. Heege*, 428 N.W.2d 535, 537 (S.D. 1988), and it may be issued only where the applicant has no, "plain, speedy, and adequate remedy in the ordinary course of law." SDCL 21–30–2. *See also Heege, supra.* In *Heege*, this Court held a circuit court had no jurisdiction to issue a writ of prohibition based on the Regents' alleged unfair labor practices because COHE failed to exhaust available administrative remedies. Because of some similarities between *Heege* and this case, we directed the parties to brief the issue of the availability to COHE of a "plain, speedy, and adequate remedy in the ordinary course of law."

 [¶ 9.] Given the primacy of the constitutional issues presented here, we conclude *Heege* is distinguishable and that this Court does have jurisdiction to consider issuance of a writ of prohibition in this matter. While the presence of constitutional questions is not alone sufficient to defeat the principle of exhaustion of administrative remedies followed in *Heege*, the exhaustion requirement must be considered in light of the claims involved in the case. As explained in *Gottschalk v. Hegg*, 89 S.D. 89, 93, 228 N.W.2d 640, 642 (1975):

" 'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process

has run its course. 'Primary jurisdiction,' on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. Western P. R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126, 132.

[¶ 10.] Here, in contrast with *Heege*, there are no claims of unfair labor practices that require resort to an administrative process. Rather, all of the claims concern implementation of an allegedly unconstitutional legislative act that may affect the collective bargaining rights of certain individuals. We conclude that neither principles of exhaustion nor primary jurisdiction require this Court's deference to an administrative proceeding and that COHE has no other plain, speedy or adequate remedy in the ordinary course of law.

## ISSUE TWO

[¶ 11.] **Does section 31 of the 1998 general appropriations bill (SB 242) violate article XII, section 2 of the South Dakota Constitution?**

[¶ 12.] Article XII, section 2 of the South Dakota Constitution specifies what may be included in the general appropriations bill. It provides:

The general appropriation bill shall embrace nothing but appropriations for ordinary expenses of the executive, legislative and judicial departments of the state, the current expenses of state institutions, interest on the public debt, and for common schools. All other appropriations shall be made by separate bills, each embracing but one object, and shall require a two-thirds vote of all the members of each branch of the Legislature.

SD Const art XII, § 2.

[¶ 13.] Section 31 of SB 242 states:

It is the intent of this Act that the distribution of salary increases to non-CSA em-

ployees of the Board of Regents be made in a manner to be determined at the sole discretion of the Board of Regents, any other provisions of chapter 3–18 notwithstanding.

COHE argues section 31 exceeds the limitations imposed by article XII, section 2 because it effectively abrogates the collective bargaining rights of the public employees COHE represents under SDCL ch. 3–18. The Regents counter that section 31 merely gives direction on the expenditure of funds appropriated for fiscal year 1999 and, therefore, it is part of the appropriation and not violative of article XII, section 2.

[¶ 14.] In *State v. Jorgenson*, 81 S.D. 447, 450–51, 136 N.W.2d 870, 872 (1965), this Court discussed the limitations imposed on the contents of a general appropriations bill by article XII, section 2. We stated:

A general appropriation bill is not legislation in the true sense of the term. It is as its language implies "a setting apart of the funds necessary for the use and maintenance of the various departments of the state government already in existence and functioning. * * * In providing that it should embrace nothing else, the framers of the Constitution undoubtedly intended that members of the legislature should be free to vote on it knowing that appropriations and nothing else were involved." *Sellers v. Frohmiller*, 42 Ariz. 239, 24 P.2d 666. Its singular subject is the appropriation of money. It serves no other purpose and its contents are constitutionally defined and limited.

[¶ 15.] This is not to state that the general appropriations bill is limited to a list of departments and funds appropriated to those departments.

[I]nherent in the power of appropriation is the power to specify how the money shall be spent. Therefore, in addition to distinct "items" of appropriation, the legislature may include in an appropriation bill qualifications, conditions, limitations or restrictions on the expenditure of funds which would not be dealt with more properly in a separate bill.

*Henry v. Edwards*, 346 So.2d 153, 157 (La. 1977). *See also Brown v. Firestone*, 382 So.2d 654, 663 (Fla.1980) (legislature may attach qualifications or restrictions to use of appropriated funds); *Bayne v. Secretary of State*, 283 Md. 560, 392 A.2d 67, 75 (1978) (legislature may place conditions on budget bill with respect to sum appropriated for program without violating prohibition against legislating in the budget).

[¶ 16.] There is a fine line between permissible qualifications, conditions, limitations and restrictions and impermissible legislation in an appropriations bill. As observed by the Louisiana Supreme Court in *Henry*, "[t]he distinction between what constitutes a condition or limitation properly included in a general appropriation bill and what amounts to a provision which is essentially a matter of general legislation more appropriately dealt with in a separate enactment appears, on first consideration, to be difficult to draw." *Henry*, 346 So.2d at 158.

[¶ 17.] Nevertheless, even the Regents' own authorities indicate that, "an appropriations bill must not change or amend existing law on subjects other than appropriations." *Brown*, 382 So.2d at 664. *See also Henry*, 346 So.2d at 158 (general appropriations bill cannot be encumbered with substantive pieces of legislation); *Bayne*, 392 A.2d at 75 (Legislature may place conditions on budget bill provided conditions do not amend substantive legislation).

[¶ 18.] While this Court has not spoken on this precise issue, in *Jorgenson, supra*, we found Arizona authorities of assistance in interpreting the limits imposed by article XII, section 2 of our Constitution. Consistent with the views expressed in *Henry, supra, Brown, supra*, and *Bayne, supra*, these same authorities have held:

The general appropriation bill can contain nothing but the appropriation of money for specific purposes, and such other matters as are merely incidental and necessary to seeing that the money is properly expended for that purpose only. *Any attempt at any other legislation in the bill is void.* An attempt, therefore, to repeal the general legislation set up in sec. 1350, supra, in the general appropriation bill would necessarily be invalid and of no effect.

*State v. Angle*, 54 Ariz. 13, 91 P.2d 705, 708 (1939) (emphasis added). *Accord Litchfield Elementary, Etc. v. Babbitt*, 125 Ariz. 215, 608 P.2d 792, 800 (Ariz.Ct.App.1980).

[¶ 19.] Based upon these authorities, it is clear that while the Legislature is free to impose conditions and restrictions on appropriated funds within the body of a general appropriations bill, it may not substantively legislate in that bill in a manner that changes, amends or repeals existing law.

[¶ 20.] Applying this standard to section 31 of SB 242, we perceive no impropriety in the clause requiring "distribution of salary increases ... be made in a manner to be determined at the sole discretion of the Board of Regents[.]" We see no distinction between a directive of this nature and one requiring the Regents to distribute funds appropriated for salary increases at the rate of three percent across the board to each employee. Clearly such expressions of legislative intent are valid conditions imposed upon funds appropriated for salary increases and represent a valid exercise of the Legislature's power to control the purse strings of state government. *See Henry*, 346 So.2d at 158. Moreover, the clause does not change, amend or repeal existing law because, the Regents already had ultimate discretion or authority over the manner of distributing salary increases to their employees subject to collective bargaining and good faith negotiating obligations under SDCL ch. 3–18. *See Heege*, 428 N.W.2d at 541 (Regents, while under duty to negotiate in good faith, are not required to agree to a contract or any specific rates of pay, wages or other conditions). *See also Jewell Nursery Co. v. State*, 4 S.D. 213, 56 N.W. 113, 114 (1893)(authority of Regents subject to power of Legislature to fix general appropriations limits beyond which Regents have no authority to bind state by contract).

[¶ 21.] We cannot reach a like conclusion as to that part of section 31 of SB 242 stating, "any other provisions of chapter 3–18 notwithstanding." Clearly this clause was inserted to change, amend or repeal whatever collective bargaining rights the Regents' employees might otherwise enjoy under SDCL ch. 3–18. The Regents themselves recognized this by mentioning in the agenda of their March meeting that:

> Normally, the Board would be constrained by South Dakota's collective bargaining laws and would be required to engage in negotiations with the Board's faculty union, the Council of Higher Education (COHE), before distributing unit faculty salary increases. The Board's General Counsel, Dr. Shekleton, advises that this language frees the Board from that requirement.

We can reach no conclusion other than that the last clause of section 31 was an attempt to change, amend or repeal existing law (SDCL ch. 3–18) on collective bargaining, a subject other than appropriations. As such, it was improperly included in the general appropriations bill. *Henry, supra; Brown, supra; Bayne, supra; Angle, supra*.[3]

[¶ 22.] While, legislative acts are presumed to be constitutional, that presumption disappears when the unconstitutionality of the act is, "clearly and unmistakenly shown and there is no reasonable doubt that it violates constitutional principles." *Poppen v. Walker*, 520 N.W.2d 238, 241 (S.D.1994) (citations omitted). Here, we are left with no reasonable doubt over the unconstitutionality of the last clause of section 31 of SB 242 and, therefore, we hold that clause violates article

---

3. As noted in Judge Zinter's concurrence on this issue, section 31 also cannot be upheld as preemptive legislation because, by its own terms, it leaves the distribution of salary increases in, "the sole discretion of the Board of Regents[.]" *See In Re IFPTE Local 195 v. State*, 88 N.J. 393, 443 A.2d 187, 192 (1982)(negotiation is preempted only if statute or regulation speaks in the imperative and leaves nothing to the discretion of the public employer). Because section 31 is not preemptive legislation, the distribution of salary increases remains a negotiable item subject to collective bargaining. It follows that, because the last clause of section 31 would change this existing law, it is a matter of substantive legislation that may not be passed within the body of the general appropriations bill. This analysis also resolves any argument based upon appropriations for salary increases that mandate a three percent across the board distribution. In contrast with the discretion given to the Regents by section 31, a mandatory three percent distribution leaves no room for discretionary action and is, therefore, preemptive legislation.

XII, section 2 of the South Dakota Constitution.

## ISSUE THREE

[¶ 23.] **Does section 31 of the 1998 general appropriations bill (SB 242) violate article III, section 21 of the South Dakota Constitution?**

[¶ 24.] COHE asserts section 31 of SB 242 also violates article III, section 21 of the South Dakota Constitution which provides: "No law shall embrace more than one subject, which shall be expressed in its title." [4]

> Article III, Section 21 of the South Dakota Constitution has three purposes:
>
> (1) To prevent the combining into one bill of several diverse measures which have no common basis except, perhaps, their separate inability to receive a favorable vote on their own merits;
>
> (2) To prevent the unintentional and unknowing passage of provisions inserted in a bill of which the title gives no intimation; and,
>
> (3) To fairly apprise the public of matters which are contained in the various bills and to prevent fraud or deception of the public as to matters being considered by the Legislature. *We have interpreted Section 21 to contain two requirements: " 'First, that no law shall embrace more than one subject, and second, that the subject shall be expressed in the title.' "* The requirements of this provision are mandatory.

*Accounts Management, Inc. v. Williams,* 484 N.W.2d 297, 302 (S.D.1992) (citations omitted)(emphasis added).

[¶ 25.] The vast majority of SB 242 does embrace only one subject——appropriations. However, to paraphrase reasoning applied in *Accounts Management, supra,* the portion of section 31 attempting to change, amend or repeal COHE's collective bargaining rights under SDCL ch. 3–18 is not subsumed within the general subject of the bill. It does not (1) relate directly to the subject of appropria-

tions, (2) have a natural connection to that subject, or (3) relate to that subject as stated in the title. In short, changing, amending or repealing collective bargaining rights under SDCL ch. 3–18 has nothing to do with setting apart funds necessary for the use and maintenance of the departments of state government including the Board of Regents.

[¶ 26.] The second requirement that must be analyzed is whether the subject of changing, amending or repealing collective bargaining rights under SDCL ch. 3–18 is expressed in the title of the appropriations bill. The title reads:

> An Act to appropriate money for the expenses of the legislative, judicial, and executive departments of the state, certain officers, boards, and departments, for support and maintenance of the educational, charitable, and penal institutions, the South Dakota Veterans' Home, for maintenance of the state capitol, and for support and maintenance of the state guard.

Once again to paraphrase analysis from *Accounts Management, supra,* the central question is: Does this title put a person on notice of the subject of changing, amending or repealing collective bargaining rights under SDCL ch. 3–18? The title expresses the subject of appropriating money for the expenses of various state entities. The part of section 31 changing, amending or repealing collective bargaining rights under SDCL ch. 3–18 is hardly a part of that subject and no reasonable individual concerned with any aspect of SDCL ch. 3–18 would be put on inquiry that provisions altering collective bargaining rights under SDCL ch. 3–18 would be included in the bill.

[¶ 27.] Based upon the foregoing, we find the last clause of section 31 of SB 242 violates article III, section 21 of our Constitution. *See S.D. Physician's Health Group v. State,* 447 N.W.2d 511, 514 (S.D.1989) (legislative act found unconstitutional under article III, section 21 where narrowing of statute produced by the bill could not be gleaned from its title).

---

4. Such an argument typically goes hand in hand with the argument that a matter of substantive legislation has been improperly included in a general appropriations bill. *See Brown,* 382

So.2d at 663 (rule that appropriations bills shall contain provisions on no other subject a. corollary to rule that every law shall embrace but one subject).

## ISSUE FOUR

**[¶ 28.] Is COHE entitled to a writ of prohibition?** [5]

[¶ 29.] COHE's petition seeks a peremptory writ of prohibition in the following terms:

[Y]our petitioners pray that this Court issue an Alternative Writ of Prohibition to the Respondents herein to desist or refrain from issuing contracts based upon, and from paying, or distributing or allocating any funds other than in accordance with the existing salary schedule, without adherence to the provisions of SDCL Chapter 3–18 until further Order of this Court, and to show cause before the Court why Respondents should not be absolutely restrained from doing so.

[¶ 30.] Our determination that the last clause of section 31 of the general appropriations bill is unconstitutional does not necessarily translate into issuance of the specific writ of prohibition COHE seeks. We therefore must first decide to what extent the general appropriations bill survives our determination of unconstitutionality because without appropriations or appropriations for salary increases nothing remains for the Regents to distribute.

[¶ 31.] At the outset, the vast majority of the general appropriations bill is unaffected by our determination of the unconstitutionality of the last clause of section 31. As we held in *Duxbury v. Harding*, 490 N.W.2d 740, 747 (S.D.1992), "the invalidity of these appropriations does not render the entire General Appropriation Bill void or affect the validity or invalidity of the remaining appropriations as the various appropriated funds are severable in nature." *Accord Jorgenson, supra.*

■ [¶ 32.] The only appropriated funds that may not be severable in nature from the last clause of section 31 are those funds appropriated for salary increases for certain Regents' employees. Clearly the last clause of section 31 was intended as a condition or limitation on the expenditure of these funds.

Thus, we must question whether the appropriation can withstand the unconstitutionality of the condition or limitation.

Unconstitutional provisions of a statute may be extracted and the remainder left intact. *State ex rel. Wieber v. Hennings,* 311 N.W.2d 41 (S.D.1981). The "doctrine of separability" requires this court to uphold the remaining sections of a statute if they can stand by themselves and if it appears that the legislature would have intended the remainder to take effect without the invalidated section. *Hogen v. South Dakota State Board of Transportation,* 245 N.W.2d 493 (S.D.1976).

*Simpson v. Tobin,* 367 N.W.2d 757, 768 (S.D. 1985).

■ [¶ 33.] Our review of the record persuades us that the Legislature would have intended the appropriation for salary increases for Regents' employees to take effect even without the unconstitutional clause in section 31 on collective bargaining. We reach this conclusion for various reasons. First, "the burden to show that the legislature would not have enacted the statute without the severed portion is on the shoulders of the person arguing against severability." 2 Norman J. Singer, *Sutherland Statutory Construction* § 44.04 (5th ed 1992–93). The Regents have failed to carry this burden. The only authority they offer in support of a finding of nonseverability applies a standard of review clearly at odds with our own precedent on this issue. *Compare Mayor of Boston v. Treasurer & Receiver Gen.,* 384 Mass. 718, 429 N.E.2d 691, 695 (1981) (where reviewing court is unable to know whether Legislature would have enacted a particular bill without the unconstitutional provision, it will not sever, but will strike the entire statute), *with Matthews v. Linn,* 78 S.D. 203, 208, 99 N.W.2d 885, 888 (1959) (where reviewing court cannot say the Legislature would not have enacted the remainder of the chapter without the offending paragraph, the holding of unconstitutionality is limited to the assailed paragraph).

[¶ 34.] Second, based upon their affidavits [6] in the record, several legislative leaders have

---

5. It is not necessary to consider the remainder of COHE's arguments concerning the unconstitutionality and invalidity of section 31 of the 1998 general appropriations bill.

6. Judge Zinter's dissent on this issue assails our reference to these affidavits. However, not only

indicated they were aware of the Regents' problems with salary competitiveness and of the Regents' plan for addressing these problems long before the 1998 legislative session. Despite pre-session discussions of the plan with these leaders, the Regents entered into the session with *no* proposal for altering or abrogating the existing collective bargaining rights of their employees. Thus, it is clear that, at the outset, collective bargaining was not the major concern of the Regents or of the legislative leadership in addressing salary competitiveness.

[¶ 35.] Third, according to the record, despite various committee hearings and subcommittee meetings on the salary competitiveness funding plan during the session, the unconstitutional clause on collective bargaining was only added to the appropriations bill on the eve of the last day of the regular session when the bill was passed. Thus, it is also clear collective bargaining was not the prevailing concern in addressing salary competitiveness during the duration of the legislative session.[7]

[¶ 36.] Fourth, while some legislators have indicated section 31 of the appropriations bill was a key component in passing the Regents' salary competitiveness funding plan, other legislators have stated they were unaware of section 31 and have recently been surprised to learn of its inclusion.

[¶ 37.] Fifth, even those legislators who have stated section 31 was a key component in passing the Regents' salary plan have also stated the provision was not intended to amend previous legislative enactments. This makes clear that the Legislature's primary concern in enacting section 31 was to preserve the Regents' ultimate discretion over the manner of distributing salary increases, not to alter or abrogate any collective bargaining rights under existing law.

[¶ 38.] Based upon the foregoing, we believe the Legislature would have appropriated funds for salary increases for Regents' employees even without the unconstitutional clause of section 31 dealing with collective bargaining. Accordingly, our holding of unconstitutionality is limited to that clause. *See Matthews,* 78 S.D. at 208, 99 N.W.2d at 888 (where we cannot say the Legislature would not have enacted the remainder of the chapter without the offending paragraph, the holding of unconstitutionality is limited to the assailed paragraph). As this Court noted in *State v. Wilder,* 73 S.D. 330, 341, 42 N.W.2d 891, 897 (1950):

> "Laws are not to be sacrificed by courts on the assumption that legislation is the play of whim and fancy * * *. Our right to destroy is bounded by the limits of necessity. Our duty is to save unless in saving we pervert." *People ex rel. Alpha Portland Cement Co. v. Knapp,* 230 N.Y. 48, 129 N.E. 202, 207.

Here, given the legislative history of the Regents' salary plan and the statements of legislative intent about the plan submitted to this Court, we perceive no perversion of legislative intent in saving the appropriations for salary increases for Regents' employees while striking the last clause of section 31 of the general appropriations bill.

[¶ 39.] Having determined that appropriations do remain intact for distribution of salary increases to Regents' employees, we must next decide whether COHE is entitled to that part of the writ it seeks ordering the Regents to, "desist or refrain from ... dis-

---

did the Regents fail to object to this allegedly incompetent evidence, they submitted it. *See Kuper v. Lincoln–Union Elec. Co.,* 1996 SD 145, ¶ 42, 557 N.W.2d 748, 760 (incompetent evidence admitted without objection may be considered to have the same force and effect as proper evidence). Moreover, the affidavits are the only evidence of non-severability relied upon by the Regents. While under the authorities cited by the dissent we might be just as well placed in excluding the affidavits and ending our inquiry here, we choose instead to address the Regents' contentions.

7. The dissent's point that the legislative process involves a long series of public hearings, discourse, debate and development of compromises and amendments is well taken. *See infra* at ¶ 59. It is also precisely the point here where there was no such series of hearings or debates on the important issue of collective bargaining and the rights of public employees were summarily taken away at the midnight hour. We decline to view such hasty action on such a crucial issue as a key component of a carefully crafted salary plan submitted at the very outset of the legislative session.

tributing or allocating any funds other than in accordance with the existing salary schedule[.]"[8] We deny this request. COHE offers no support for the proposition that the salary schedule under the collective bargaining agreement in effect for fiscal year 1998 should somehow bind distribution of funds appropriated for salary increases for fiscal year 1999.[9] Moreover, there is almost no information in the record on the duration or effective dates of the collective bargaining agreement or contract that was in effect for fiscal year 1998. The only such information we identify is the affidavit of COHE's president which indicates the most recent imposed contract was scheduled to run only until June 30, 1998. COHE can claim no better version of the facts than it has itself presented. *See Miller v. Lake Area Hosp.*, 1996 SD 89, ¶ 14, 551 N.W.2d 817, 820–21 (claimant cannot claim a better version of the facts than her own testimony). Since the most recent imposed contract expired on June 30, 1998 and the 1998 general appropriations bill took effect on July 1, 1998 (SDCL 2–14–16), there is no basis on which to bind distribution of salary increases for fiscal year 1999 to the salary schedule established under the expired contract. Accordingly, COHE's petition for a writ of prohibition in this regard is denied.

[¶ 40.] Finally, we must consider whether COHE is entitled to that part of the writ it seeks ordering the Regents to, "desist or refrain from issuing contracts based upon, and from paying, or distributing or allocating any funds ... without adherence to the provisions of SDCL Chapter 3–18[.]" This request we grant. By their own concession, in distributing salary increases for fiscal year 1999 and in implementing their salary competitiveness improvement plan, the Regents have attempted to bypass collective bargaining obligations to COHE that are otherwise imposed by SDCL ch. 3–18. They have followed this course with reliance on a clause of

section 31 of the 1998 general appropriations bill which we have determined to be unconstitutional. To arrest further proceedings by the Regents in this regard, we order them and their executive director, immediately upon service of the peremptory writ of prohibition we now grant, to cease distribution of funds appropriated for salary increases for fiscal year 1999 without first adhering to whatever further collective bargaining obligations may be imposed upon them by SDCL ch. 3–18.

[¶ 41.] It is so ordered.

[¶ 42.] SABERS, and AMUNDSON, JJ., concur.

[¶ 43.] GILBERTSON, J., concurs with writing.

[¶ 44.] ZINTER, Circuit Judge, concurs in part and dissents in part.

[¶ 45.] ZINTER, Circuit Judge, for KONENKAMP, J., disqualified.

GILBERTSON, Justice (concurring).

[¶ 46.] I fully join in the opinion of the Court. I write only to examine points on two issues.

[¶ 47.] As to issue two, the situation here is far different from that where the Legislature enacts a three percent raise for all COHE members. In such an instance, there is nothing for the Regents or COHE to negotiate as by Legislative mandate all will get three percent no matter what subsequent COHE–Regents negotiations yield. Whatever Legislative direction[10] contained in Section 31 of SB 242 is far different. Placing salary dollars with the Regents to be distributed "at the sole discretion of the Board of Regents" allows it in theory to give all the funds to one professor, to a limited group of professors at one institution, or any infinite combinations up to and including an across-

---

8. Because this writ was requested before July 1, 1998, the phrase "existing salary schedule" would refer to the schedule in effect before July 1, 1998.

9. Fiscal year 1998 ended on June 30, 1998 and fiscal year 1999 began on July 1, 1998. SDCL 4–10–10.

10. COHE did not raise the issue of constitutional delegation of authority from the Legislature to the Board of Regents. *See generally Boever v. South Dakota Bd. of Accountancy*, 1997 SD 34, 561 N.W.2d 309; *Boe v. Foss*, 76 S.D. 295, 77 N.W.2d 1 (1956).

the-board raise. Obviously, the discretionary formula for this distribution of funds affects COHE membership and its representatives should be allowed to be heard thereon. To conclude that this bill changes SDCL ch. 3–18 requires no more than an examination of the text of SDCL 3–18–2, which provides in part, "[p]ublic employees shall have the right to designate representatives for the purpose of meeting and negotiating with the governmental agency or representatives designated by it with respect to ... conditions of employment[.]" To this is now added a caveat; except funds appropriated by § 31 of SB 242 for 1998 which are to be distributed "at the sole discretion of the Board of Regents."

[¶ 48.] I do not view issue four as being determined by statements of individual legislators concerning the intent of the Legislature as a whole. Unlike evidence offered in *Cummings v. Mickelson,* 495 N.W.2d 493 (S.D.1993), this is not an attempt by an individual Legislator to make his or her subjective reasoning on why he or she voted for a bill become the intent of the Legislative body as a whole. Rather, this documentation was provided as background as to the nature of the problem and why and how the Legislature sought to address it. Both parties to this action submitted affidavits from Legislators to provide this background. Given the fact this is an original action filed in this Court with no time nor procedure for taking live testimony, it was a recognized method of informing this Court of the necessary facts. To this end neither party objected to this method of production of evidence, but instead sought to challenge its content by contradictory evidence submitted in the same manner.

[¶ 49.] The Legislature does not address a problem in an evidentiary vacuum. *See In re Estate of Jetter,* 1997 SD 125, ¶ 16, n. 5, 570 N.W.2d 26, 29, n. 5 (noting views of the members of the State Bar of South Dakota on why this State adopted the Uniform Probate Code are nonbinding but persuasive "commentary"); *In re Certif. of Questions (Knowles v. United States),* 1996 SD 10, ¶¶ 60–62, 544 N.W.2d 183, 195–96 (legislative background and investigation into medical malpractice insurance crisis); *Brandriet v. Larsen,* 442 N.W.2d 455, 460 (S.D.1989) (rec-

ommendations of the South Dakota Commission on Child Support as a basis for the enactments incorporated into SDCL 25–7–7). Given the expedited nature of these original proceedings, the use of affidavits by Legislators as to the background of this case was proper and did not constitute a forbidden attempt to transfer subjective intent of one Legislator into the collective intent of the entire body.

ZINTER, Circuit. Judge (concurring in part, dissenting in part) ,

[¶ 50.] I concur and join the special writing of Justice Gilbertson on Issue Two. Although the Legislature could have preempted Petitioners' ch. 3–18 rights had it dictated how the appropriation should be spent, it declined to preempt those rights when it left the distribution within the sole discretion of the Regents. *See Rapid City Educ. v. Rapid City Area School,* 376 N.W.2d 562 (S.D.1985); *AFSCME Local 1922 v. State,* 444 N.W.2d 10, 14 (S.D.1989). In the absence of a preemptive appropriation, the second clause of § 31 was general legislation which changed Petitioners' ch. 3–18 right to negotiate wages. I dissent from that portion of Issue Four which concludes that the appropriation for salary raises can be severed from the Legislature's "condition" on that appropriation.

### ISSUE FOUR

[¶ 51.] **Issuance of a writ of prohibition.**

[¶ 52.] On the issue of severability, I agree that the partial invalidity of § 31 does not render the entire general appropriations bill void or affect the validity of other appropriations. However, I respectfully disagree that an appropriation for raises and an express condition on that same appropriation can be severed.

[¶ 53.] As the majority notes, the rule generally applicable to all legislative acts is that severability should occur "if [the remainder] can stand by [itself] and if it appears that the legislature would have intended the remainder to take effect without the invalidated section." *Simpson v. Tobin,* 367 N.W.2d 757, 768 (S.D.1985) (citing *Hogen v. South Dakota*

*State Board of Transportation,* 245 N.W.2d 493 (S.D.1976)). Thus, the dispositive question is one of legislative intent.

[¶ 54.] In *State v. Wilder,* 73 S.D. 330, 42 N.W.2d 891 (1950), we articulated the test to determine whether invalid portions of appropriations bills may be severed. We noted:

"[I]f they are so *mutually connected with and dependent on each other, as conditions,* considerations, or compensations for each other as to warrant a belief that the legislature intended them as a whole, and that, if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, *all the provisions which are thus, dependent, conditional, or connected must fall with them.*"

*Wilder,* 73 S.D. at 341, 42 N.W.2d at 897 (citations omitted) (emphasis added).

[¶ 55.] Here the majority expressly acknowledges that the last clause of § 31 was intended as a "condition or limitation on the expenditure of these funds." *Supra* at ¶ 32. *Wilder* requires that "all the provisions which are thus dependent, conditional, or connected must fall." 73 S.D. at 341, 42 N.W.2d at 897. Because § 31 is a "condition or limitation on the expenditure of the funds," I believe we have no choice but to invalidate the conditional and mutually connected appropriation for the raises. Because both conditions of § 31 are explicit, we certainly should not assume that the Legislature would have passed the same raise in the same amount without either condition. Therefore, I cannot join in an order which will require that the raises be distributed after collective bargaining when the Legislature expressly conditioned the appropriation to reach the opposite result.

[¶ 56.] The majority concludes that the Legislature would have passed this specific salary increase without the collective bargaining condition. It does so by relying on the burden of proof where a party fails to establish legislative intent. The majority also utilizes four underlying conclusions. The four underlying conclusions are:

*Second, based upon their affidavits in the record, several legislative leaders have indicated* they were aware of the Regents' problems with salary competitiveness and of the Regents' plan for addressing these problems long before the 1998 legislative session. Despite pre-session discussions of the plan with these leaders, the Regents entered into the session with no proposal for altering or abrogating the existing collective bargaining rights of their employees. *Thus, it is clear that, at the outset, collective bargaining was not the major concern of the Regents or of the legislative leadership in addressing salary competitiveness.*

*Third, according to the record, despite various committee hearings* and subcommittee meetings on the salary competitiveness funding plan during the session, *the unconstitutional clause on collective bargaining was only added to the appropriations bill on the eve of the last day of the regular session when the bill was passed. Thus, it is also clear collective bargaining was not the prevailing concern in addressing salary competitiveness* during the duration of the legislative session

*Fourth,* while *some legislators have indicated* section 31 of the appropriations bill was a key component in passing the Regents' salary competitiveness funding plan, *other legislators have stated they were unaware of section 31 and have recently been surprised to learn of its inclusion.*[11]

*Fifth, even those legislators* who have stated section 31 was a key component in passing the Regents' salary plan *have also stated the provision was not intended to*

---

**11.** The majority's reliance on the affidavit of a legislator as support for this conclusion is misplaced for additional reasons. Although the majority refers to "some legislators," there was only one affidavit from a legislator that made reference to being surprised by the inclusion of § 31 in the general appropriations bill. Moreover, this legislator was absent from the committee meeting when the amendment was added. He also stated that he was not aware of the amendment. If inadmissible affidavits of legislators are to be admitted, this evidence should not detract from the clarity of intent expressed by the legislators who were involved with the amendment. We have previously rejected statements of intent proffered by participants who were absent from the relevant committee meeting. *Cummings v. Mickelson,* 495 N.W.2d 493, 499 n. 7 (S.D.1993).

*amend previous legislative enactments. This makes clear that the Legislature's primary concern in enacting section 31 was to preserve the Regents' ultimate discretion over the manner of distributing salary increases, not to alter or abrogate any collective bargaining rights under existing law.* Supra ¶¶ 34–37 (emphasis added). In my judgment neither the majority's burden of proof analysis nor these conclusions support severance.

[¶ 57.] First, we should not resort to a burden of proof analysis on legislative intent because the language of § 31 is unambiguous. This Court has "repeatedly stated that when the terms of a statute are clear, certain and unambiguous in their meaning, it is the function of the court to give them effect and not to amend the statute to avoid or produce a particular result." *Matter of Sales Tax Refund Applications,* 298 N.W.2d 799, 802 (S.D.1980) (citing *Elfring v. Paterson,* 66 S.D. 458, 285 N.W. 443 (1939)). "Unless exceptional circumstances dictate otherwise," judicial inquiry into the meaning of a statute is complete once the Court finds that the terms of the statute are unambiguous. *Burlington No. R. Co. v. Okla. Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404, 412, (1987) (citations omitted).

[¶ 58.] Here, the language of § 31 is clearly conditional. Salary increases were to be made at the discretion of the Board of Regents *without collective bargaining.* The majority itself notes that the collective bargaining restriction was "intended as a condition or limitation on the expenditure of [the] funds [appropriated for salary increases.]" *Supra* at ¶ 32. Because the clear language of § 31 conditioned the appropriation, we should not consider who carried the burden of proof of extrinsic evidence on legislative intent.

[¶ 59.] In conclusion three, the majority also permits severance because it erroneously concludes that collective bargaining was not the Legislature's "prevailing concern." The majority discerns an absence of concern because the Regents' salary plan was discussed at various times, but § 31 was not added until the eve of the last day of the legislative session.

[¶ 60.] However, the timing of an amendment has no relationship to the Legislature's level of concern over that amendment. The legislative process deliberately involves a long series of opportunities for public hearings, discourse and debate. That process is designed to raise new issues and to *develop* compromises and amendments as the process continues. New concerns routinely develop throughout that process. This is especially true with appropriation matters where expenditure requests and revenue projections are not finalized until the end of the legislative session. The "prevailing concerns" of the Legislature are certainly not limited to those developed at the beginning of the session. Absent a survey of the entire Legislature, we should not adopt a rule of construction that a late amendment expresses any less a concern than an early amendment. If anything, a *late* amendment may be *more* indicative of its importance to the passage of legislation as it represents the final position of the Legislature after consideration and debate.[12] Therefore, although § 31 may have been added on the eve of the last day, I find no record evidence to support the majority's conclusion that the timing of this amendment indicates it was not a prevailing concern of legislators in appropriating salary increases.

[¶ 61.] Additionally, the foundation for conclusions two, four, and five consists of inadmissible, after-the-fact affidavits of legislators purportedly expressing their motives and legislative intent. Consideration of those affidavits is improper for two reasons: First, as mentioned above, there is no need to look beyond the clearly conditional language of the amendment. Second, even if we

---

12. For example, the Continental Congress did not begin its session with a draft of the Declaration of Independence. After Jefferson submitted his draft of the Declaration, the Congress, in the waning days and hours before the final vote and as a result of heated debate (and much to Jefferson's consternation) made numerous revisions to the Declaration. Many of the revisions changed the intent of the various parts of the Declaration and had a significant bearing on its passage. See Willard Sterne Randall, *Thomas Jefferson: A Life,* 269–276 (1993).

look beyond the text of the plain language to ascertain legislative intent, we should not rely upon inadmissible evidence.[13]

[¶ 62.] With respect to extrinsic evidence of legislative intent, we have generally stated that although:

> the true intent of the Legislature must be ascertained primarily from the language of the statute itself, without resort to extraneous devices, *State Theatre Co. v. Smith,* 276 N.W.2d 259 (S.D.1979), ... other considerations may be included ... [such as the act's] title, the history of its enactment, and the state of the law already in existence, ... because the Legislature must have resorted to [these] same means to arrive at its purpose.

*Matter of Sales Tax Refund Applications,* 298 N.W.2d at 802 (quoting *Elfring,* 66 S.D. at 462, 285 N.W. at 445). However, these "other considerations" have never included after-the-fact affidavits of individual legislators. In fact, we have specifically cautioned against consideration of such evidence:

> Views of individuals involved with the legislative process as to intent have not received the same recognition from this Court. We held such individual testimony of no assistance in *State v. Bushfield,* 69 S.D. 172, 176, 8 N.W.2d 1, 3 (1943) for two reasons: (1) it is the intent of the legislative body that is sought, not the intent of the individual members who may have diverse reasons for or against a proposition and (2) it is "universally held" that "evidence of a ... draftsman of a statute is not a competent aid to a court in construing a statute." The case now before us shows the wisdom of this prior holding.

*Cummings v. Mickelson,* 495 N.W.2d at 499 n. 7.

[¶ 63.] Other respected authorities confirm that after-the-fact testimony of legislators regarding the intent of legislation and the testimony of legislators opposed to the legislation are inadmissible. 2A *Sutherland Statutory Construction* § 48.16 (5th ed) (citing numerous jurisdictions). Legislative testimony on motive is also inadmissible.

> References to the motives of members of the legislature in enacting a law are uniformly disregarded for interpretive purposes except as expressed in the statute itself. The reasons which prompted various members to enact the law may be varied, conflicting and difficult to determine, and they may be unrelated to any consideration about the meaning of the statute.

*Id.* at § 48.17.

[¶ 64.] Our neighboring states agree. *See Ruthven Consol. v. Emmetsburg Community,* 382 N.W.2d 136, 140 (Iowa 1986) ("In common with most states we will not consider a legislator's private interpretation of the statute, even if the legislator was actively involved in drafting and enacting the legislation."); *Matter of State Farm Mut. Auto. Ins. Co.,* 392 N.W.2d 558, 569 (Minn.App. 1986) ("Subsequent testimony by individual legislators regarding legislative intent is inadmissible in construing a statute."); *Snyder's Drug Stores, Inc. v. North Dakota St. Bd. of Pharmacy,* 202 N.W.2d 140 (N.D.1972) (Courts refuse to consider testimony of legislators as to the intent of the legislature.); *Independent Producers Marketing Corp. v. Cobb,* 721 P.2d 1106 (Wyo.1986) ("Affidavits by legislators or other persons involved in the enactment of a statute are not a proper source of legislative history."); *Shepoka v. Knopik,* 201 Neb. 780, 272 N.W.2d 364, 365 (1978) (Testimony as to intention of a resolution was "clearly inadmissible" at trial.) Because conclusions two, four, and five are so heavily based on this inadmissible evidence, I cannot join in those conclusions.

[¶ 65.] I also cannot join the majority decision to sever because the *admissible extrin-*

---

**13.** The majority states that it considered the affidavits only to address the Regents' contentions. *Supra* at ¶ 34 n. 6. There are two problems with this explanation. First, SDEA and COHE are the parties seeking the writ from this Court. They were also the first to introduce a legislator's affidavit regarding intent. Second, regardless of who submitted the affidavits, after-the-fact testimony of individual legislators regarding legislative intent is inadmissible. The majority's analysis of alleged legislative intent to permit severance is heavily based on those affidavits. Under our cases, only the clear and unambiguous expression of intent found in the text SB 242, as well as intent expressed through admissible legislative history, should be considered.

*sic evidence*[14] of legislative intent reveals that the provision regarding ch. 3–18 is inextricably tied to the first part of § 31 and to the appropriation for the salary raises. The record reflects that before the legislative session, the Governor proposed cutting 30 positions from various universities to free up $1,613,960 in general funds. The Governor then proposed to give this $1.6 million back to the Regents to allow them to adjust salaries according to the Regent's merit-based and competitive salary augmentation program. State of South Dakota Governor's Budget Report Fiscal Year 1999, Summary of Recommended Budget Adjustments, p. 7.

[¶ 66.] The minutes of the Joint Appropriations Committee show that *from the outset* of the legislative session the Legislature had differing plans for the $1.6 million. In January, the Senate Majority Leader proposed an amendment that would have used the $1.6 million to enhance other state employee salaries. Minutes, South Dakota Joint Appropriations Committee, p. 2 (Jan. 23, 1998). The amendment was received favorably by the Committee. *Id.* at 3. However, the Regents requested more time to discuss the amendment's ramifications on their budget. *Id.* In the days following, the Regents attempted to regain the $1.6 million that would have been lost had that amendment become a part of the general appropriations bill. *See* Memorandum from Robert Perry to Members of the Joint Appropriations Committee (Jan. 27, 1988).

[¶ 67.] In this effort the Regents did two significant things. First, they assured the Legislature of their desire to institute the market and merit-based salary increases. Second, they noted that the main hindrance to implementing their proposed plan was the negotiations with COHE. *See* Letter from Robert Perry to Rep. Richter (Jan. 29 1998).[15]

[¶ 68.] In early February, the Regent's budget came up for further discussion. The House Majority Leader noted his support for the $1.6 million allotment to the Regents, but then indicated that he wanted the committee to change the funding methods and "noted they should start with a base, then *reward efficiencies*." (The Regent's Plan). Minutes, South Dakota Joint Appropriations Committee, p. 1 (Feb. 4, 1998)(emphasis added). Much of the remaining committee minutes concerning the Regent's budget also referenced the desire to reward efficiencies and promote competition at the various universities. *See generally, id.* at 1–6. Therefore, contrary to the majority's conclusions, both the Legislature and the Regents were concerned throughout the legislative session that the raises would be spent according to the Regents' proposed salary program. Furthermore, neither intended that collective bargaining would change the Regent's plan.

[¶ 69.] Moreover, even if we now adopt a rule permitting admission of after-the-fact affidavits of the legislators, a preponderance of such evidence refutes conclusions two, four, and five. The affidavits of the Chairman of the Senate Appropriations Committee and the Chairman of the House Appropriations Committee affirm that the $1.6 million was a point of contention among legislators and that many felt it "could be better utilized elsewhere." Affidavit of Sen. Frederick at ¶ 10 (May 19, 1998) (hereinafter Frederick); Affidavit of Rep. Richter at ¶ 12 (May 19, 1998) (hereinafter Richter). Moreover, both noted that "at the same time ... there were other proposed uses for the $1,613,960 ... [including] a request to utilize those moneys to increase the general salary package for other state employees." *Richter* at ¶ 11;

---

14. Again, this is assuming that there is even a need to consider extrinsic evidence given the clearly conditional language of § 31.

15. Despite this admissible evidence of raising the collective bargaining issue in the early days of the session, the majority concludes that the issue was not submitted at the outset. *See supra* at n. 7. The majority also concludes that the collective bargaining amendment was "hasty action," "summarily taken" at the "midnight hour." *Id.*

I respectfully submit these conclusions fail to consider public knowledge of the day-to-day workings of the appropriations committees (the committees regularly work at night, and they do not finalize the bill until the last days of the session). The majority's conclusions, on this record, begin to usurp the Legislature's exclusive power to determine its internal rules and procedure.

*Frederick* at ¶ 9. Most importantly, the Senate Chairman commented:

A key component, and critical to my support of the [Regent's] proposal, was a proposed amendment to the general appropriations bill which subsequently became Section 31 of Senate Bill 242. The purpose of this amendment was to make clear that it was the Legislature's intent that funds for salary increases of noncareer service act employees of the Board of Regents contained in the general appropriations bill were not to be distributed across the board [as Petitioners desire] or *in any manner* inconsistent with the *Regents' discretion* which was conveyed to the Joint Appropriations Committee through its proposed salary competitiveness funding plan.

*Frederick* at ¶ 12 (emphasis added); *see also, Richter* at ¶ 14. In light of the Regent's concerns and the Senate Chairman's statements, this appropriation for salary raises was clearly tied to both conditions in § 31. The Legislature clearly intended that the raises would be distributed under the Regents' plan without collective bargaining. It simply makes little sense to conclude that the Legislature intended the Regents to go through the idle art of collective bargaining before implementing the salary plan the Regents and the Legislature had already approved.

[¶ 70.] Because I agree with the majority that "clearly the last clause of § 31 was intended as a condition or limitation on the expenditure of these funds," I do not believe that the appropriation can be severed from its "condition or limitation."

[¶ 71.] I concur with the majority's denial of Petitioners' request to distribute the raises in accordance with Petitioners' existing salary schedule. Petitioners' other arguments have no merit under our established precedent.