**AMERICAN MEAT INSTITUTE and John Morrell & Company,**
**Plaintiffs,**

v.

**Mark W. BARNETT, Attorney General of the State of South Dakota and Darrell Cruea Secretary of Agriculture of the State of South Dakota, Defendants,**

**Prairieland Pork Producers, Inc., Intervenor.**

**No. 99–3017.**

United States District Court, D. South Dakota, Central Division.

Aug. 31, 1999.

Jeremiah D. Murphy, Boyce, Murphy, McDowell & Greenfield, Sioux Falls, South Dakota, Michael H. Wetmore, Husch & Eppenberger, St. Louis, Missouri, for plaintiffs.

Charles D. McGuigan, Diane M. Best, Lawrence E. Long, Jeffrey P. Hallem, Assistant Attorney Generals, Pierre, South Dakota, for defendants.

Jeffrey T. Sveen, Siegel, Barnett & Schutz, Aberdeen, South Dakota, for intervenor.

## MEMORANDUM OPINION AND ORDER

KORNMANN, District Judge.

### INTRODUCTION

[¶ 1] Plaintiffs instituted this declaratory judgment action, seeking a declaration that portions of Senate Bill 95, enacted by the 74th Session of the South Dakota Legislature, now codified as SDCL 40–15B, are unconstitutional. Governor Janklow signed the measure on March 3, 1999, and the statute (hereinafter, "the pricing statute") became effective July 1, 1999. The specific claims are that the provisions of the law dealing with price discrimination are in violation of the Commerce Clause, Article I, Section 8, Clause 3, of the United States Constitution (and in particular the Dormant Commerce Clause) and that such provisions are void for vagueness. Plaintiffs also seek a preliminary injunction enjoining enforcement of the pricing statute pending a decision as to the constitutionality of that statute. Pursuant to Fed. R.Civ.P. 65(a)(2), the trial of this action on the merits was advanced and consolidated with the hearing on the application for a preliminary injunction.

[¶ 2] Prairieland Pork Producers, Inc. ("Prairieland"), with leave of court, intervened, seeking a declaratory judgment that portions of the pricing statute are unconstitutional as in violation of the Commerce Clause. Prairieland moved to amend its pleading in intervention to add claims that portions of the pricing statute are unconstitutional as in violation of the Contracts Clause, Article I, Section 10, of the United States Constitution and that portions of the pricing stature are void for vagueness. The motion to amend was granted.

[¶ 3] Findings of fact and conclusions of law have been entered and form the basis of this memorandum opinion.

## BACKGROUND

[¶ 4] South Dakota farmers and ranchers, like their colleagues in other states, are at great financial risk today. Prices being received are often less than the costs of production. Federal policies and laws are sometimes misguided and cause harm to producers. World markets have been lost or greatly diminished. An oversupply of farm and ranch products further reduces prices paid to producers. These producers are often victims of their own increasing productivity, unlike other segments of the economy. Like any other person who produces wealth from the ground, they are unable to set their prices but must rely on what buyers will pay. Producers in South Dakota also face an unfair system of taxation where land is virtually the only wealth which is taxed for the support of our public schools. Independent and smaller producers face, as do small businesspeople, increasing competition from large corporations.

[¶ 5] There is increasing and sometimes alarming concentration occurring in the agricultural industry. There are very few buyers for livestock today and producers face an "oligopsony". That is particularly the case in South Dakota with only three packers. Since the 1970's, the meatpacking industry has become increasingly concentrated. The current market share of the four largest packers is approximately 80% for steer and heifer slaughter, 80% for boxed beef, 73% for sheep and 54% for hogs.

[¶ 6] Packers have the market power in each livestock market to influence or determine prices paid to producers for livestock. Packers sometimes enter into contracts with producers conditioned upon the contract price for livestock not being disclosed. Requirements of confidentiality are imposed. As in any buyer-seller arrangement, packers seek to pay as low prices as possible.

[¶ 7] Presently, only packers have complete knowledge of livestock purchases and pricing. Only a relatively small portion of livestock purchasing and pricing information is available to the public, including producers, through the U.S. Department of Agriculture market news reports or other sources. Information regarding contract purchases and captive livestock supplies is largely unreported. This results in published purchasing and pricing information that understates actual purchases and actual prices paid for livestock.

[¶ 8] The South Dakota Legislature and Governor William Janklow reacted to the great frustrations of South Dakota farmers and ranchers, including livestock producers, and their families and friends by enacting Senate Bill 95, which became effective July 1, 1999, becoming chapter 204 of the Session Laws of 1999. This chapter, together with chapter 205 of the Session Laws of 1999, was codified as SDCL 40–15B. Chapter 205 was the result of another legislative Act and was codified at SDCL 40–15B–8. No challenge is presented as to SDCL 40–15B–8.

[¶ 9] SDCL 40–15B provides:

**40–15B–1. Definitions.** Terms used in §§ 40–15B–1 to 40–15B–8, inclusive, mean:

(1) "Livestock," live cattle, swine, or sheep;

(2) "Packer," a person who is engaged in the business of slaughtering livestock or receiving, purchasing, or soliciting livestock for slaughtering, the meat products of which are directly or indirectly to be offered for resale or for public consumption. Packer includes an agent of the packer engaged in buying or soliciting livestock for slaughter on behalf of a packer. Packer does not include a cold storage plant or frozen food locker plant.

**40–15B–2. Price discrimination by packer prohibited—Exemption.** A packer purchasing or soliciting livestock for slaughter in this state may not discriminate in prices paid or offered to be paid to sellers of that livestock. This section does not apply to the sale and purchase of livestock if the following requirements are met:

(1) The price differential is based on the quality of the livestock, if the packer purchases or solicits the livestock based upon a payment method specifying prices paid for criteria relating to carcass merit; actual and quantifiable costs related to transporting and acquiring the livestock by the packer; or an agreement for the delivery of livestock at a specified date or time; and

(2) After making a differential payment to a seller, the packer publishes information relating to the differential pricing, including the payment method for carcass merit, transportation and acquisition pricing, and an offer to enter into an agreement for the delivery of livestock at a specified date or time according to the same terms and conditions offered to other sellers.

**40–15B–3. Terms and conditions to be uniform.** A packer shall provide all sellers with the same terms and conditions offered to a seller who receives a differential price based on any of the criteria described in § 40–15B–2.

**40–15B–4. Packer to report prices paid.** A packer shall, at the end of each day during which livestock are purchased or contracted, provide to the United States Department of Agriculture, agricultural market service livestock market news branch, and the South Dakota Department of Agriculture, all prices paid for livestock, both contract and direct purchased, that day.

**40–15B–5. Agreements in violation of provisions voidable—Violation as fraudulent.** Any agreement made by a packer in violation of §§ 40–15B–1 to 40–15B–8, inclusive, is voidable. Any packer acting in violation of this section is guilty of a fraudulent practice.

**40–15B–6. Attorney general to enforce provisions—Action to restrain violation—Civil action—Treble damages.** The attorney general shall enforce the provisions of §§ 40–15B–1 to 40– 15B–8, inclusive, and the Department of Agriculture shall refer any violations of these provisions to the attorney general. The attorney general or any person injured by a violation of these provisions may bring an action in circuit court to restrain a packer from violating these provisions. A seller who receives a discriminatory price or who is offered only a discriminatory price for livestock based upon a violation of these provisions by a packer has a civil cause of action against the packer and, if successful, shall be awarded treble damages.

**40–15B–7. Packer to make available daily report of prices paid—Forms— Seller's identity not to be revealed— Penalties for violation.** Any packer shall make available for publication and to the Department of Agriculture, a daily report setting forth information regarding prices paid for livestock, under each contract in force, in which the packer and a South Dakota resident are parties for the purchase of the livestock by the packer, and which sets a date for delivery more than twenty days after the making of the contract.

The reports shall be completed on forms prepared by the department for comparison with cash market prices for livestock according to procedures required by the department in rules promulgated pursuant to chapter 1–26. The report may not include information regarding the identity of a seller.

A failure of a packer to report as required by this section is punishable by a civil penalty not to exceed one thousand dollars for each day that a timely or truthful report is not published. The department shall refer to the attorney general any packer or packer's agent who the department believes is in violation of the provisions of §§ 40–15B–1 to 40–15B–8. The attorney general may, upon referral from the department, file an action in circuit court to enforce these provisions.

**40–15B–8. Certain acts by packers prohibited.** No packer, with respect to livestock, meats, meat food products, or

livestock products in unmanufactured form, and no live poultry dealer with respect to live poultry, may:

(1) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device;

(2) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever;

(3) Sell or otherwise transfer to or for any other packer or any live poultry dealer, or buy or otherwise receive from or for any other packer or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if the apportionment has the tendency or effect of restraining commerce or of creating a monopoly;

(4) Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

(5) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

(6) Conspire, combine, agree, or arrange with any other person to apportion territory for carrying on business, or to apportion purchases or sales of any article, or to manipulate or control prices; or

(7) Conspire, combine, agree, or arrange with any other person to do, or aid and abet the doing of, any act made unlawful by subdivisions (1) to (5), inclusive, of this section.

[¶ 10] Morrell and the vast majority of packers purchase livestock only for slaughter. A small percentage of those animals purchased are resold because they cannot be slaughtered due to USDA inspection failure. Only packers who purchase livestock for slaughter are covered by the statute.

[¶ 11] American Meat Institute ("AMI") is a national trade association representing packers and processors of meat and meat food products sold throughout the United States. Its members acquire livestock from producers in South Dakota and elsewhere. Long Prairie Packing ("Long Prairie"), d/b/a Cimpl Meats, and John Morrell & Company ("Morrell") are members of AMI.

[¶ 12] Morrell purchases hogs from Minnesota, Iowa, Nebraska, North Dakota, Canada, South Dakota, and other states (the total number of states being 20 in 1998) for slaughter at its Sioux Falls, South Dakota, plant and also slaughters hogs at its plant in Sioux City, Iowa. Morrell is a packer and, in 1988, paid over $106,000,000 to South Dakota hog producers. Morrell must purchase hogs from other states since South Dakota producers do not produce nearly enough hogs to meet slaughter requirements at Morrell's plant in Sioux Falls.

[¶ 13] Morrell in Sioux Falls purchased hogs in 1998 from 6,289 different producers, 2,454 of whom were from South Dakota. In 1998, Morrell acquired 2.2 million hogs, or 75% of the total number of hogs purchased by Morrell for slaughter in Sioux Falls, from non-South Dakota producers.

[¶ 14] Hogs were purchased by Morrell by one of three methods: (1) for cash, (2) based on grade and yield, or (3) by forward contract. Cash basis sales are completed when the Morrell buyer and the producer strike such a deal and payment is made immediately. A cash basis sale also occurs when livestock are purchased at a livestock public auction market and the producer, through the livestock auction, is

also paid immediately. The sale is complete, and the packer (just like other purchasers) own the livestock, at the auction barn or at the producer's facility, when the animals are purchased on a cash basis.

[¶ 15] A printout of the actual grade and yield of hogs purchased on a cash basis has historically been available from Morrell to the producer who sold the hogs if requested by the producer. If no request was made, no such information was furnished. Such information was not available to the general public.

[¶ 16] The grade and yield method (also described as "carcass merit") starts with a guaranteed base price. After slaughter, the animal is graded based upon a published matrix and the yield is measured. The price of the hog is then determined (higher or lower than the base price) and Morrell at that time issues a check to the producer. When hogs are purchased on a grade and yield basis, the producer receives a scale ticket with the weight recorded. The producer may have received a brochure with the grade and yield policy described. The scale ticket does record the base price. If a hog dies prior to slaughter, it is the producer's loss. A check must, by law, be issued to the producer within 24 hours after the animal is slaughtered. In 1998, Morrell purchased approximately 74% of butcher hogs using this method.

[¶ 17] The price paid for hogs contracted to be delivered in the future is based upon estimated prices published by the Chicago Mercantile Exchange. When hogs are purchased on contract, a base price is guaranteed but the sale is not complete until the hog is slaughtered and graded at the Sioux Falls plant. This information may be included in the contract. Morrell, prior to July 1, 1999, acquired approximately 75% of its Sioux Falls slaughter on a grade and yield basis, which included forward contracts.

[¶ 18] Prior to July 1, 1999, it was the producer's decision whether to sell hogs to Morrell on a cash basis, grade and yield basis or forward contract method. Packers decided whether or not to attend livestock auction market sales and bid to purchase livestock.

[¶ 19] It is important to Morrell's profitability that it be allowed to vary the cash price (and the grade and yield base price) paid throughout the day to compete against competitors and to obtain the supply (number) of hogs needed for the rest of the day's kill. Historically, the cash price or the base price would be increased during the day if more hogs were needed. The cash price or the base price offered later in the day would be lowered if the supply was large. Cash prices and base prices were also varied to reflect the estimated grade and yield of an animal, the number of hogs available from the producer, and merit or slaughter factors, including abrasions and the hair color of the hog (which may have an impact on the processing machines and thus affect productivity).

[¶ 20] The cash price offered for hogs delivered very early in the morning was generally higher to encourage early morning delivery to ensure that enough animals would be available to continually operate the slaughter line. In addition, early morning deliveries posed less risk to Morrell as to death or disease and offered less cost as to feeding and care before slaughter. Producers in close proximity to Morrell would have an advantage as to being better able to make early morning deliveries.

[¶ 21] Prior to July 1, 1999, Morrell paid an average base price of $1.12/cwt more for hogs purchased from South Dakota producers on a grade and yield basis as compared to producers outside South Dakota. Morrell paid an average of $1.26/cwt more for hogs purchased from South Dakota producers on a cash basis as compared to producers outside South Dakota. This price disparity was, in part, a conscious decision to support local producers.

[¶ 22] In fear of being in violation of the pricing statute, which Morrell interpreted as applying to any packer buying livestock anywhere to be slaughtered in Sioux Falls, Morrell ceased buying hogs anywhere on

other than a grade and yield basis. Morrell feared that any other method of purchasing would or could subject it to civil suits for treble damages under the pricing statute. Before July 1, 1999, cash prices paid would be sometimes higher and sometimes lower than prices paid on the basis of grade and yield since, when Morrell was buying on the cash basis, it was using an educated guess as to what the grade and yield would be.

Since July 1, 1999, Morrell has been purchasing strictly on a grade and yield basis and offering the same base price all day. This has resulted in a lower overall average price being offered to producers. The slaughter numbers are down at Morrell's Sioux Falls plant, resulting in a less efficient plant.

[¶ 23] Prairieland, located in Huron, South Dakota, negotiates for and markets hogs for a large number of producers from South Dakota, North Dakota and Iowa. It is not a packer as packer is defined in the statute. It acts only as an agent for producers. Prairieland negotiates and sells its members' hogs to eleven different packers, one (Morrell) of which is located in South Dakota. Prairieland has typically and consistently marketed hogs which are higher than average lean and, prior to July 1, 1999, was receiving for its producers a premium over prices paid to other producers. This was based upon the quality of the hogs and Prairieland's ability to supply large and dependable quantities of hogs. All hogs sold through Prairieland were, before July 1, 1999, sold on a grade and yield basis. The majority of Prairieland's hogs were sold to Swift for slaughter in Minnesota. Some were sold to Morrell for slaughter in South Dakota and some to Iowa Beef Processors ("IBP") for slaughter in Iowa.

[¶ 24] Prairieland received notices from both Morrell and Swift & Company ("Swift"), a Minnesota packer, advising that they would, as of July 1, 1999, no longer honor previous oral contracts with Prairieland and will no longer do business with Prairieland on the same basis as was done prior to July 1, 1999. Since July 1, 1999, Prairieland has received an average of $2.25 less per hog, as compared with sales before July 1. In nine business days following July 7, 1999, Prairieland marketed 9,000 hogs to Swift. Since July 1, 1999, two other out of state packers have refused to do business with Prairieland, the packers not wishing to do business in South Dakota as a result of the pricing statute. Attorney General Barnett has advised foreign packers that they are subject to the pricing statute if they solicit or purchase livestock in South Dakota for slaughter in another state. The packers' response to the pricing statute has adversely affected Prairieland's ability to negotiate prices with both in state and out of state packers. Since July 1, 1999, there is no longer a packer "cash market" for hogs in South Dakota.

[¶ 25] A company known as Long Prairie owns and operates a packing plant under the name of Cimpl Meats at Yankton, South Dakota. It is a packer. Long Prairie buys livestock in nine different states at 130 different livestock auction markets, with approximately 30 auctions running on a given day. Approximately 30 of those auction houses are in South Dakota. The price at a livestock market cattle auction is affected by the demand at that auction, the number of buyers, the number of sellers, the productivity of packing plants that day and hundreds of other factors commonly found in the livestock business and the packer business. Long Prairie has not changed its buying habits in response to the pricing statute and has continued to pay different prices to different producers and different prices for livestock at various livestock auction market sales without attempting to comply with SDCL 40–15B–2(2).

## DECISION

### I. Statutory Construction.

[¶ 26] "To succeed in a constitutional challenge to a legislative act, the challenger must prove beyond a reason-

able doubt that the legislature acted outside of its constitutional authority." *Wegleitner v. Sattler,* 1998 SD 88, ¶ 4, 582 N.W.2d 688, 689 (1998) (quoting *City of Chamberlain v. R.E. Lien, Inc.,* 521 N.W.2d 130, 131 (S.D.1994)). In order to address the constitutionality of the pricing statute the Court must first determine the proper construction of the statute. "The construction of a statute is a question of law." *Delano v. Petteys,* 520 N.W.2d 606, 608 (1994) (quoting *Petition of Famous Brands, Inc.,* 347 N.W.2d 882, 884 (S.D. 1984)). "While, legislative acts are presumed to be constitutional, that presumption disappears when the unconstitutionality of the act is, 'clearly and unmistakenly shown and there is no reasonable doubt that it violates constitutional principles.'" *S.D.E.A. v. Barnett,* 1998 SD 84, ¶ 22, 582 N.W.2d 386, 392 (quoting *Poppen v. Walker,* 520 N.W.2d 238, 241 (S.D.1994)).

[¶ 27] The rules of statutory construction in South Dakota follow general rules of such construction.

The purpose of rules regarding the construction of statutes is to discover the true intention of the law, and said intention is to be ascertained by the court primarily from the language expressed in the statute.

In applying legislative enactments, we must accept them as written. The legislative intent is determined from what the legislature said, rather than from what we or others think it should have said.

While it is fundamental that we must strive to ascertain the real intention of the lawmakers, it is equally fundamental that we must confine ourselves to the intention as expressed in the language used. To violate the rule against supplying omitted language would be to add voluntarily unlimited hazard to the already inexact and uncertain business of searching for legislative intent.

One of the primary rules of statutory *** construction is to give words and phrases their plain meaning and effect. This court assumes that statutes mean what they say and that legislators have said what they meant. When the language of a statute is clear, certain, and unambiguous, there is no occasion for construction, and the court's only function is to declare the meaning of the statute as clearly expressed in the statute.

*South Dakota Subsequent Injury Fund v. Casualty Reciprocal Exchange,* 1999 SD 2, ¶ 17, 589 N.W.2d 206, 209 (1999), (quoting *Delano v. Petteys,* 94 SDO 700, 520 N.W.2d at 608), (quoting in turn *Petition of Famous Brands Inc.,* 347 N.W.2d at 884–85). A statute must be construed to effectuate legislative intent.

[¶ 28] The South Dakota Supreme Court has "repeatedly stated that when the terms of a statute are clear, certain and unambiguous in their meaning, it is the function of the court to give them effect and not to amend the statute to avoid or produce a particular result." *S.D.E.A. v. Barnett,* 1998 SD 84, ¶ 57, 582 N.W.2d 386, 399 (Zinter, Judge, concurring in part, dissenting in part) (quoting *Matter of Sales Tax Refund Applications,* 298 N.W.2d 799, 802 (S.D.1980)). " 'Unless exceptional circumstances dictate otherwise,' judicial inquiry into the meaning of a statute is complete once the Court finds that the terms of the statute are unambiguous." *S.D.E.A. v. Barnett,* 1998 SD 84, ¶ 57, 582 N.W.2d 386, 399 (Zinter, Judge, concurring in part, dissenting in part) (quoting *Burlington No. R. Co. v. Okla. Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404, 412 (1987)). This Court's task is to determine whether the clear and unambiguous meaning of the statute is in violation of the Constitution.

[¶ 29] The portion of the statute which is most hotly debated is the first sentence of SDCL 40–15B–2 which provides that "[a] packer purchasing or soliciting livestock for slaughter in this state may not discriminate in prices paid or offered to be paid to sellers of that livestock." The state proffered testimony concerning the legislature's intent as to how the statute should

be read and applied. Extrinsic evidence of legislative intent is not admissible. The law in South Dakota is that although

> the true intent of the Legislature must be ascertained primarily from the language of the statute itself, without resort to extraneous devices ... other considerations may be included *** [such as the act's] title, the history of its enactment, and the state of the law already in existence, ... because the Legislature must have resorted to [these] same means to arrive at its purpose ****. However, these "other considerations" have never included after-the-fact affidavits of individual legislators****. Views of individuals involved with the legislative process as to intent have not received the same recognition from [the South Dakota Supreme Court]. [The South Dakota Supreme Court has held] such individual testimony of no assistance *** for two reasons: (1) it is the intent of the legislative body that is sought, not the intent of the individual members who may have diverse reasons for or against a proposition and (2) it is "universally held" that "evidence of a *** draftsman of a statute is not a competent aid to a court in construing a statute."

*S.D.E.A. v. Barnett*, 1998 SD 84, ¶ 62, 582 N.W.2d at 400 (Zinter, Judge, concurring in part, dissenting in part) (citations omitted).

[¶ 30] "It is a general rule of statutory as well as grammatical construction that a modifying clause is confined to the last antecedent unless there is something in the subject matter or dominant purpose which requires a different interpretation." *Lewis v. Annie Creek Mining Co.*, 74 S.D. 26, 48 N.W.2d 815, 819 (1951), quoted in *Kaberna v. School Board Lead–Deadwood School District*, 438 N.W.2d 542, 543 (S.D.1989). Thus, the term "in this state" must be construed as modifying the clause "for slaughter." That being the case, that portion of the statute is clear and unambiguous as to what effect was intended. A court is to ordinarily presume that a state legislature would not intend state statutes to have force or operation beyond the boundaries of the state unless a contrary intention is clearly expressed or reasonably can be inferred from the language or purpose of the statute. The price discrimination provisions clearly were intended to apply to livestock slaughtered in South Dakota, regardless of where the livestock might be purchased.

[¶ 31] The contrary reading proffered by the state that the statute applies only to a "packer purchasing or soliciting *in this state* livestock for slaughter" would render the statutory language "for slaughter" surplusage. Clearly, the statute itself defines packer as a person engaged in the business of slaughter. SDCL 40–15B–1(2). A packer not engaged in the business of slaughter is not covered by the pricing statute. The Court "will not construe a statute in a way that renders parts to be duplicative and surplusage." *Delano v. Petteys*, 520 N.W.2d at 609. As stated, the interpretation urged by the State would render the words "for slaughter" mere surplusage.

[¶ 32] The foregoing conclusion is fully consistent with other provisions of SDCL 40–15B. The South Dakota Legislature clearly knew how to distinguish between, on the one hand, "sellers of that livestock" as used in section 2 of the Act, "a seller" and "other sellers" as used in subsection 2 of section 2, "all sellers" as used in section 3, "a seller" as used in section 6, and, on the other hand, "a South Dakota resident" who is a party for the purchase of livestock by a packer as used in section 7 (SDCL 40–15B–7), i.e., a South Dakota producer-seller. The Legislature clearly limited the reporting requirements in section 7 to contracts between a South Dakota producer and a packer but did not limit in the other sections of the Act what sellers were to be covered and to whom enforcement rights were to be granted. This statute, like the Minnesota statute in *Cotto Waxo v. Williams*, 46 F.3d 790 (8th Cir.1995), makes no reference, other than in SDCL 40–15B–7, to the location in which the

purchases occur. The court is being asked by the state to decide that the obligations of a packer to "provide *all sellers* with the same terms and conditions offered to a seller who receives a differential price" (emphasis supplied) in section 3 (SDCL 40–15B–3) means "all sellers in South Dakota" or, according to other interpretations, "all sellers from South Dakota." If the Legislature had intended to so limit the application of the pricing statute, it would have used the same language used in section 7, "a South Dakota resident" or words of similar import. It did not.

■ [¶ 33] State courts in South Dakota apply a rule of construction, if possible, to impose a "saving" construction of a legislative act unless the plain meaning of the statute is clear and unambiguous. "If a statute can be construed so as not to violate the constitution, that construction must be adopted." *Wegleitner v. Sattler*, 1998 SD 88, ¶ 4, 582 N.W.2d at 689 (quoting *Cary v. City of Rapid City*, 1997 SD 18, ¶ 10, 559 N.W.2d 891, 893). Because of serious concerns of federalism, that is not the rule when a federal court is construing a state statute. It is the rule only when a federal court is considering the constitutionality of a federal statute. A federal court has no authority to narrowly construe any state law being challenged on constitutional grounds. *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The law is, of course, to the same effect in the Eighth Circuit. A federal court is without authority to narrow state statutes in order to avoid unconstitutional vagueness. *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 691 (8th Cir.1992). It is not the function of a federal court to rewrite a state statute to cure all its constitutional infirmities. *Id.* There is no state court decision in South Dakota narrowing the language of the pricing statute.

## II. Commerce Clause.

[¶ 34] The primary challenge to SB 95 (the pricing statute) is that it violates the Commerce Clause (Art. I, § 8, cl.3) of the United States Constitution. The clause reads, in part: "The Congress shall have Power ... To regulate commerce ... among the several States."

■ [¶ 35] Because the clause is a grant of power to the U.S. Congress, the U.S. Supreme Court has read a Dormant Commerce Clause which limits an individual state from adopting "regulations that discriminate against interstate commerce." *West Lynn Creamery, Inc., v. Healy*, 512 U.S. 186, 192, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994). The Dormant Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id., quoting New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–274, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988).

■ [¶ 36] In judging Constitutional challenges to state statutes under the Dormant Commerce Clause, the U.S. Supreme Court has developed a two-tier approach. *Brown–Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 578–579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). The first tier is simple enough. If the challenged state statute "directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests," the U.S. Supreme Court has "generally struck down the statute without further inquiry." *Id.* at 579, 106 S.Ct. 2080. The United States Court of Appeals for the Eighth Circuit, in explaining this tier, teaches that "a state regulation is per se invalid when it has an 'extraterritorial reach,' that is, when the statute has the practical effect of controlling conduct beyond the boundaries of the state." *Cotto Waxo Company v. Williams*, 46 F.3d 790, 793 (8th Cir.1995).

[¶ 37] A state statute that directly regulates or discriminates against interstate commerce is subject to strict scrutiny. *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). To

withstand the Constitutional challenge, the state must show "that the statute serves a legitimate local purpose unrelated to economic protectionism and that the purpose could not be served as well by nondiscriminatory means." *Cotto Waxo,* 46 F.3d 790 at 793, *citing Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). Therefore, if the pricing statute is found to directly regulate or discriminate against interstate commerce, strict scrutiny applies and the statute can only be upheld upon a significant showing by the state that it is not striving for economic isolation.

■ [¶ 38] The second tier approach is utilized when a state statute only indirectly affects interstate commerce and regulates evenhandedly. *Brown–Forman Distillers Corporation v. New York State Liquor Authority,* 476 U.S. 573 at 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). The inquiry is whether the state's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. *Id., citing Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). This balancing test weighs the burdens of the statute on interstate commerce with the putative local benefits. *Cotto Waxo,* 46 F.3d at 793. If the burden on interstate commerce is slight and the public benefit is great, then the statute can be upheld.

■ [¶ 39] The Court must first determine if the pricing statute directly regulates or discriminates against interstate commerce. If so, then tier I is applied and the statute is per se unconstitutional and it can be saved only by a tremendous showing by the state of its local benefit and the absence of any other means to achieve that benefit. If the statute indirectly affects interstate commerce, then tier II applies. The Court must then balance the burdens on interstate commerce with the local benefits. If the benefits are greater, then the statute does not violate the Dormant Commerce Clause.

[¶ 40] In addition to the so-called two tier approach, the cited cases explain the importance of the Dormant Commerce Clause. The underlying point is to prohibit a state from practicing economic protectionism, which the United States Supreme Court defines as "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *West Lynn Creamery, Inc.,* 512 U.S. at 192, 114 S.Ct. 2205. In addition, the United States Court of Appeals for the Eighth Circuit teaches that the Dormant Commerce Clause invalidates state statutes which require people or businesses to conduct their out-of-state commerce in a certain way. *Cotto Waxo,* 46 F.3d at 793 (*citing Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 *and Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552, *for that proposition* ). If a state statute requires out-of-state commerce to be conducted according to in-state terms, then the statute burdens interstate commerce. *Cotto Waxo,* 46 F.3d at 793. For whatever relevance it may have in this case, the Commerce Clause vests Congress with ample power to enact legislation providing for the regulation of prices paid to farmers and ranchers for their products. *West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 192, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994), citing *United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), and other cases.

[¶ 41] *Brown–Forman* teaches us or reaffirms a number of legal principles already discussed. As we analyze state economic regulation under the Dormant Commerce Clause, the critical consideration for the court is the overall effect of the state law on both local and interstate activity. Any state statute that directly regulates interstate commerce is to be struck down without further inquiry. However, a statute having only indirect effects on interstate commerce and which regulates evenhandedly is to be examined in the context of whether the state's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

There is no clear line which separates the category of state regulation that is virtually per se invalid under the Dormant Commerce Clause and the category subject to the *Pike v. Bruce Church* balancing approach. It is clear that a state may not establish a scale of prices for use in other states. *Seelig*, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032. Forcing a merchant to jump through regulatory hoops in one state before undertaking a transaction in another directly regulates interstate commerce. One state may not project its legislation into another state by regulating the price to be paid for a product in the other state.

[¶ 42] Negatively affecting interstate commerce is not the same as discriminating against interstate commerce. The pricing statute does not favor in-state businesses or disfavor out-of-state businesses. Therefore, the pricing statute does not directly burden interstate commerce in that sense.

[¶ 43] It is the industry custom (agreed upon by packers and producers) that the sale is not final, on a grade and yield basis, until the hog is slaughtered and the grade and yield is determined. Thus, all grade and yield purchases made by Morrell for slaughter in Sioux Falls are made in South Dakota and not elsewhere, even in the case of hogs coming from foreign producers. Likewise, hogs produced in South Dakota and sold for slaughter on a grade and yield basis in another state do not constitute sales in South Dakota for the purposes of the pricing statute. Solicitations or agreements to buy livestock which solicitations are made in South Dakota by a South Dakota packer would, however, be covered by the pricing statute. All cash purchases of livestock made either within or without South Dakota headed for slaughter in South Dakota would be covered by the pricing statute.

[¶ 44] The effect of certain provisions of the pricing statute, as clearly written and read by the court, results in South Dakota projecting its legislation into other states and regulating the prices which must be paid by South Dakota packers to producers in other states and under what conditions prices may be paid. South Dakota packers would not be able to purchase livestock at livestock auction markets in other states without complying with SDCL 40–15B–2 and 40–15B–3, and certain agreements in foreign states would be voidable pursuant to SDCL 40–15B–5. Livestock producers in foreign states would be deprived of market choices when dealing with South Dakota packers.

[¶ 45] Strict scrutiny applies and certain provisions of the pricing statute are, beyond a reasonable doubt, unconstitutional as in violation of the Dormant Commerce Clause. Even if it could be argued that the pricing statute is not subject to strict scrutiny, given the fact that the pricing statute regulates evenhandedly as to all purchases made by South Dakota packers, it, beyond a reasonable doubt, burdens interstate commerce indirectly. Thus, applying the so-called Pike balancing test under *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the Court would consider Act's burden on interstate commerce, the local benefits of the pricing statute, and the balance between the two. Under this test, the statute violates the Commerce Clause only if the burdens it imposes on interstate commerce are "clearly excessive in relation to the putative local benefits."

The intended benefits of the price reporting portions of the pricing statute are clear. It is in the national interest to encourage and protect family farms and ranches and to enhance and promote the stability and well being of rural America. More competitive markets would result in higher prices to producers. Equal access to accurate pricing and purchase information would improve the competitiveness of the livestock market. Poor or no information can lead to unnecessary price volatility and tardy or inaccurate adjustments to changing supply and demand conditions. Inadequate or uneven information can cause producers to be disadvantaged, rela-

tive to packers. Disclosure of prices fosters competition and results in an efficient functioning of the market. Disclosure significantly reduces distrust and a certain amount of hostility which now exists between producers and packers. Information concerning prices paid by packers for livestock enables producers to be more competitive, to make management changes, including risk management decisions, and to better determine what type livestock can be produced most profitably.

[¶ 46] The Court takes judicial notice of the fact that South Dakota's Governor Janklow acted with great national and state publicity to bar or attempt to bar Canadian livestock from being shipped into South Dakota for slaughter. State troopers stopped trucks carrying Canadian livestock at the South Dakota border and turned them away, the claim of South Dakota being that the alleged inspection standards in Canada were not as stringent as inspections or tests in the United States. All this activity took place before the South Dakota Legislature convened in 1999. Reducing the supply of livestock coming into South Dakota from other states and from Canada would obviously be of great economic benefit to South Dakota livestock producers. With this background, it is far from clear that the Legislature would not have consciously attempted to put South Dakota producers on at least an even footing with livestock producers elsewhere who send livestock for slaughter in South Dakota. However, the result of the price discrimination portions of the statute has been to lower prices paid to South Dakota producers.

[¶ 47] The burdens on interstate commerce are equally clear. It would be burdensome and almost impossible to list every factor that goes into the sale of every hog each day. It is of concern that packers may be subjected to inconsistent obligations in different States. The Court takes judicial notice that a number of other Midwest states have already passed laws dealing with prices to be paid for livestock. The Missouri statute was received in evidence in this case. The concern is certainly akin to the concern expressed in *Brown–Forman Distillers Corporation v. New York State Liquor Authority*, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), as to liquor affirmation laws.

[¶ 48] A packer subject to the Act purchasing for cash at a livestock public auction market would, as a practical matter, be unable to comply with the provisions of SDCL 40–15B–2(2). A packer would be required to bid the same price for all comparable animals at the auction. If the packer wished to pay or even bid different prices for different animals, the packer, after offering a bid for a particular animal (which may or may not be the high bid since offering to buy is also covered by the pricing statute), would be required to publish (a term this is undefined in the statute) all information (perhaps simply by an announcement to all those present) as to why that packer made the bid it did and announce in advance of the next bid that the packer would purchase other livestock "according to the same terms and conditions offered to other sellers." Such a scenario is unworkable and compliance would be most detrimental to the livestock auction markets in South Dakota and elsewhere.

[¶ 49] Some of the packers' concerns with the pricing statute are valid and some are not. For example, there is no requirement in the statute that a packer must pay the same base price all day. Nor is there any requirement that packers pay all producers the same price. The fear of a multitude of lawsuits, however, is not unreasonable. Nor is the fear of any packer as to purchasing for cash under all the requirements of SDCL 40–15B–2(2).

[¶ 50] Morrell has a large number of hog buyers acting on behalf of Morrell. With numerous buyers and buying stations throughout the state, it would be impossible to pay differential prices for cash purchases and still comply with SDCL 40–15B–2(2).

[¶ 51] No local public benefit of the price discrimination provisions of the statute has been shown. Great local detriments have been shown. Thus, the scale on the one hand is empty. On the other side of the scale, there is no doubt that the pricing statute burdens interstate commerce for reasons already stated. Swift has altered its method of doing business with Prairieland, albeit based upon a misreading of the pricing statute by the defendants. Lower prices have been paid to producers because of uncertainty and fear about the effects of the pricing statute and possible lawsuits. These fears and operating out of an abundance of caution do not appear to the court to be unreasonable. South Dakota packers for various reasons have ceased all purchases for cash in other states as well as in South Dakota and producers in other states are thus deprived of one possible option for selling their livestock. Clearly, any producer from Iowa or Minnesota living in close proximity to the packing plants in Yankton or in Sioux Falls who desires to transport livestock to one of these packers is impacted by the statute as the producer crosses the state line. Decisions of foreign producers as to whether or not to deal with packers in South Dakota will be impacted by the statute. Methods of doing business by livestock market auctions would be severely impacted by the requirements of the pricing statute, despite the fact that the defendants are of the opinion that the pricing statute does not apply to packers purchasing at such markets. It does apply when packers are purchasing for slaughter in South Dakota.

[¶ 52] Applying the *Pike* balancing test, the Court finds that the burdens on interstate commerce far outweigh the benefits of the price discrimination portions of the pricing statute. SDCL §§ 40–15B–2, 40–15B–3 and 40–15B–5 violate the Dormant Commerce Clause.

[¶ 53] The Attorney General and his deputies as well as the South Dakota Secretary of Agriculture attempt to offer assurances that the state will be sensitive to Dormant Commerce Clause concerns and that the statute will be administered in a narrow manner consistent with the Constitution. However, no administrative rules were adopted at the time of trial. In addition, packers face the substantial danger of private lawsuits by producers and possible class action lawsuits, all with the prospect of treble damages. Finally, these public officials are mere temporary occupants of these offices. "The protections afforded by the Commerce Clause cannot be made to depend on the good grace of a state agency." *Brown–Forman Distillers Corp.*, 476 U.S. at 581, 106 S.Ct. 2080.

### III. Void for Vagueness.

[¶ 54] As to the claim of void for vagueness, this is a Fourteenth Amendment argument. The void for vagueness standard in this case is examined with a less critical eye than when examining a criminal statute or a statute with a First Amendment implication. A statute must be set out in terms that an ordinary person exercising ordinary common sense can sufficiently understand and be able to comply with the statute without sacrifice to the public interest. Otherwise stated, a statute must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and "provide explicit standards for those who apply the statute." *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 689 (8th Cir.1992).

[¶ 55] The attack on the basis of vagueness is directed toward SDCL 40–15B–2. A number of people of more than ordinary intelligence have differed greatly on what the section means and what is prohibited as well as what is permitted. The defendants' interpretations, as stated in briefs and during the trial, differ in several respects with the deposition testimony of Senators Paul Symens and Frank Kloucek, two of the prime sponsors of the pricing statute. The two Senators disagree to some minor extent between themselves. The packers and their expert witness have other interpretations. These differences, however, do not mandate a

conclusion that SDCL 40–15B–2 is void for vagueness. There is no need to address this issue and the Court declines to do so.

## IV. Severability.

[¶ 56] Turning now to the balance of the pricing statute and the question of severability, the "rule generally applicable to all legislative acts is that severability should occur 'if [the remainder] can stand by [itself] and if it appears that the legislature would have intended the remainder to take effect without the invalidated section.'" *S.D.E.A. v. Barnett*, 1998 SD 84, ¶ 53, 582 N.W.2d at 397 (Zinter, Judge, concurring in part, dissenting in part) (quoting *Simpson v. Tobin*, 367 N.W.2d 757, 768 (S.D.1985)). The test for determining whether invalid portions of a legislative act may be severed is:

> If they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other as to warrant a belief that the legislature intended them as a whole, and that, if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus, dependent, conditional, or connected must fall with them.

*S.D.E.A. v. Barnett*, 1998 SD 84, ¶ 54, 582 N.W.2d at 398 (Zinter, Judge, concurring in part, dissenting in part) (quoting *State v. Wilder*, 73 S.D. 330, 42 N.W.2d 891, 897 (1950)).

[¶ 57] It is clear from a reading of SDCL 40–15B as a whole that the price discrimination provisions were designed to assist in price reporting. Nonetheless, there is ample evidence in the record and matters as to which the Court has taken judicial notice that price reporting has benefits to producers which are separate and distinct from the hoped-for benefits of the price discrimination provisions of the Act.

[¶ 58] Section 2 of Senate Bill 95, SDCL 40–15B–2, must be struck as unconstitutional. Because Section 3 is explicitly tied to Section 2, SDCL 40–15B–3 must also be struck. It is clear from a reading of the Act as a whole that Section 3 is dependent on a section which must be struck and Section 3 would not have been passed independently of Section 2.

[¶ 59] Likewise, since Section 5 of the Act, SDCL 40–15B–5, is tied in part to Section 2, it must also be struck. Without Section 2, there can be no agreement made in violation of the Act. Price reporting by itself does not entail "an agreement made by a packer" and that section should therefore also be struck.

[¶ 60] Section 4 of the Act, SDCL 40–15B–4, has not been challenged as unconstitutional. This provision is not directly tied to any Constitutionally infirm portion of the Act. Therefore, under the rules set forth above, severability is appropriate.

[¶ 61] Section 7 of the Act, SDCL 40–15B–7, specifically limits itself to reporting contracts between packers and South Dakota residents. This is a price reporting provision and has not been directly challenged. This provision is not directly tied to any Constitutionally infirm portion of the Act. Therefore, under the rules set forth above, severability is appropriate.

[¶ 62] SDCL 40–15B–8 is simply a restatement of the Federal Packers and Stockyards Act. The constitutionality of this section has not been challenged. This provision is not directly tied to any Constitutionally infirm portion of the balance of SDCL 40–15B. It was also the product of a separate legislative act.

[¶ 63] Section 6 of the Act, SDCL 40–15B–6, is the enforcement provision of both the price discrimination and price reporting sections of the Act. The last sentence of Section 6 which allows a private right of action for discriminatory pricing is directly tied to and dependent upon Sections 2 and 3. Therefore, that portion of Section 6 must be struck. However, the balance of Section 6 is not limited to price

discrimination but is also tied to price reporting. There is no impediment to severing this portion of the statute, which will necessarily be read to apply only to enforcement of those sections not struck.

■ [¶ 64] Section 1 of the Act, SDCL 40–15B–1, sets forth the definitions to be used in this statute. Both terms encompassed in this provision are used in the price reporting sections which are being severed. Therefore, it is appropriate to sever this provision as well.

## ORDER

[¶ 65] Based upon the foregoing,

[¶ 66] IT IS ORDERED:

1. Plaintiffs' and intervenor's requests for a declaratory judgment herein are granted in part.

2. SDCL 40–15B–2 is unconstitutional and unenforceable. SDCL 40–15B–3, SDCL 40–15B–5, and the last sentence of SDCL 40–15B–6 are also struck as not severable.

3. SDCL 40–15B–1, SDCL 40–15B–4, SDCL 40–15B–7, SDCL 40–15B–8, and all portions of SDCL 40–15B–6 other than the last sentence are severed and remain in full force and effect.

4. Plaintiffs' and intervenor's motions for preliminary injunctive relief, Doc. 3, are denied as moot.