# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-2506

_____

Hampton Feedlot, Inc.; GM Feedlot,
Inc.; Bob Vandiver Cattle Co.;
American Meat Institute; Missouri
Cattleman's Assoc.; Missouri
Livestock Marketing Assoc.,

    Appellees,

     v.

Jeremiah W. Nixon, Attorney General
of the State of Missouri; John L.
Saunders, Director of Agriculture
of the State of Missouri,

    Appellants.

\*
\*
\*
\*
\*
\*
\*
\*
\*   Appeal from the United States
\*   District Court for the
\*   Western District of Missouri.
\*
\*
\*
\*
\*
\*

_____

Submitted: March 14, 2001

Filed: May 14, 2001

_____

Before MORRIS SHEPPARD ARNOLD and HEANEY, Circuit Judges,
  and BATTEY[1], District Judge.

_____

_____

[1]The Honorable Richard H. Battey, United States District Judge, for the District
of South Dakota, sitting by designation.

HEANEY, Circuit Judge.

This case involves the dormant Commerce Clause of the United States Constitution. The appellees, Hampton Feedlot, Inc.; GM Feedlot, Inc.; Bob Vandiver Cattle Co.; Missouri Cattleman's Association; Missouri Livestock Marketing Association; and the American Meat Institute, filed a declaratory judgment action against Missouri's Attorney General and Director of Agriculture in their official capacities, claiming that provisions of Missouri's Livestock Marketing Law, Mo. Ann. Stat. § 277. 200, .203, .209, and .212 (2000), were unconstitutional. The district court granted permanent injunctive relief to the plaintiffs before the statute took effect, concluding that those provisions of the statute violated the dormant Commerce Clause of the United States Constitution. The state appeals, arguing that the court should not have substituted its judgment for that of the legislature in rejecting a statute whose benefits exceed any perceived burden on interstate commerce. Because appellees have failed to establish that the cited provisions of § 277 are unconstitutional, we reverse.

I. Background

Missouri farmers and feedlots prepare cattle and hogs for slaughter. Out-of-state packers purchase the livestock in Missouri, then ship the animals out of Missouri to be slaughtered because there are no major cattle slaughterhouses in the state. Appellees explain in their brief that Missouri has four to six feedlots, with a capacity of 24,000 cattle; within 150 miles of the Missouri border there are thirty-six feedlots with the capacity of over two million cattle. As a result, there is tremendous competition among the Missouri feedlots to obtain the business of livestock producers and packers.

There are four methods of purchasing cattle and hogs in Missouri: "live on a cash basis," "flat in the meat," "grade and yield," and auction. All methods of payment are

2

available to packers and producers by express terms of the statute. Auction sales are not affected by the statute and will not be discussed here.

The first method, live on a cash basis, involves a series of negotiations between the seller and the packer to arrive at a final price based on an estimated value of the animal. The basis for the price is the entire weight of the live animal. Since cattle that are sold in this manner are priced and sold when alive, the actual quality of the cattle cannot be known with certainty when they are sold. Hampton Feedlot and Vandiver Cattle sell the majority of their cattle on a live on a cash basis.

Flat in the meat, the second method of sale, is based on the weight of the carcass, which is the weight of the live animal minus the head, hooves, hide, and entrails. The price of animals sold in this manner is also estimated and negotiated between seller and packer prior to slaughter. GM Feedlot sells the majority of its cattle on a flat in the meat basis.

Finally, the grade and yield method of sale is based on the actual quality of the animal, which is determined after slaughter because the tremendous genetic diversity in cattle makes it impossible to predict the actual value of the live animal. The packer sets a base price for the animal before slaughter. After the animal is slaughtered a representative of the U.S. Department of Agriculture (USDA) evaluates the carcass for its grade (quality) and its yield (the amount of desirable meat). Once the grade and yield are determined, the packer adjusts the final price up or down.

Currently, the seller determines which pricing method will be used based on its estimate of which method will produce the best price for the particular cattle being sold. Hampton Feedlot and Vandiver Cattle generally sell their cattle live, rather than on a grade and yield basis, because they receive a higher price for their cattle. Appellees assert that the nature of the cattle industry is such that no pricing method is universally best for all cattle, and that flexibility in method of sale is essential to their business.

3

The Missouri legislature enacted § 277 in the summer of 1999 to eliminate price discrimination in the purchase of Missouri livestock.  The statute provides, in part:

> A packer purchasing or soliciting livestock in this state for slaughter shall not discriminate in prices paid or offered to be paid to sellers of that livestock.  The provisions of this section shall not be construed to mean that a price or payment method must remain fixed throughout any marketing period.  The provisions of this section shall not apply to the sale and purchase of livestock if the following requirements are met:
>
> 1) The price differential is based on the quality of the livestock, if the packer purchases or solicits the livestock based upon a payment method specifying prices paid for criteria relating to carcass merit; actual and quantifiable costs related to transporting and acquiring the livestock by the packer; or an agreement for the delivery of livestock at a specified date or time; and
>
> 2) After making a differential payment to a seller, the packer publishes information relating to the differential pricing, including the payment method for carcass merit, transportation and acquisition pricing, and an offer to enter into an agreement for the delivery of livestock at a specified date or time according to the same terms and conditions offered to other sellers.

Mo. Ann. Stat. § 277.203.  Enforcement of the law is vested in the Attorney General and in any seller of livestock who believes he has not received or been offered the highest price paid by a packer for livestock of comparable quality.  Any seller who receives or is offered a discriminatory price is entitled to treble damages and attorneys fees.

Appellees' witnesses argued at trial that the statute, if implemented, would jeopardize Missouri feedlots' business and unduly burden interstate commerce. Witnesses for the state testified that the statute is beneficial to farmers and the farming industry as a whole, and explained that it will lead to an improvement in the quality of Missouri livestock, potentially increasing demand and price paid for meat. The district court held that the statute violates the dormant Commerce Clause because the law's burden on interstate commerce outweighs its putative local benefits. It concluded, as a factual matter, that the packers and producers that currently buy Missouri livestock would likely avoid doing business in Missouri if § 277 were implemented, thus harming Missouri's farming economy.[2]

II. Discussion

This court reviews the district court's conclusions of law de novo and its conclusions of fact under a clearly erroneous standard. Anderson v. Bessemer City, 470 U.S. 564, 573 (1985); Friends of the Boundary Waters Wilderness v. Thomas, 53 F.3d 881, 885 (8th Cir. 1995).

In order to prevent economic balkanization among the states, the dormant Commerce Clause prohibits certain state regulation even when Congress has failed to legislate on the subject. Oklahoma Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 179-80 (1995). When a state or local regulation is alleged to violate the dormant Commerce Clause, we use two frameworks to evaluate the claim. First, if the law in question overtly discriminates against interstate commerce, we will strike the law

---

[2]The court below found that "packers in Missouri will only utilize the Grade and Yield method of purchasing" and that "some out-of-state producers will send their livestock to feedlots in other states to sell utilizing other methods, instead of sending the livestock to feedlots in Missouri" if the Missouri statute is implemented. Hampton Feedlot, Inc. v. Nixon, No. 99-4206-CV-C-SOW-ECF, slip op. at 6-7 (W.D. Mo. March 24, 2000).

unless the state or locality can demonstrate, "under rigorous scrutiny, that it has no other means to advance a legitimate local interest." U & I Sanitation v. City of Columbus, 205 F.3d 1063, 1067 (8th Cir. 2000) (quoting C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 392 (1994). For purposes of the dormant Commerce Clause, "discrimination" means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Oregon Waste Sys., Inc. v. Dep't. of Envtl. Quality, 511 U.S. 93, 99 (1994).

Second, even if a law does not overtly discriminate against interstate commerce, the law will be stricken if the burden it imposes upon interstate commerce is "clearly excessive in relation to the putative local benefits." U & I Santitation, 205 F.3d at 1067 (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)). Those challenging the legislative action have the burden of showing that the statute's burden on interstate commerce exceeds its local benefit. Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 464 (1981).

We must first determine, therefore, whether the Missouri statute directly regulates or discriminates against interstate commerce. The statute requires packers to disclose any price that they offer to pay or pay to sellers of livestock for slaughter unless the packers purchase livestock on a grade and yield basis. The statute does not eliminate any method of sale; it simply requires price disclosure.

This price discrimination statute is similar to a measure enacted in South Dakota. See Am. Meat Inst. v. Barnett, 64 F. Supp.2d 906 (D. S.D. 1999). In that case, the statute was intended to apply to livestock slaughtered in South Dakota, regardless of where the livestock was purchased, resulting in South Dakota's regulation of cattle sales in other states. The court found that the pricing statute did not favor in-state business over out-of-state business, and therefore did not directly burden interstate commerce on its face. Id. at 919. The district court ruled that the statute was

6

unconstitutional, however, because the effect of certain provisions of the statute had an "extraterritorial reach," making the statute unconstitutional:

> South Dakota [is] projecting its legislation into other states and regulating the prices which must be paid by South Dakota packers to producers in other states and under what conditions prices may be paid. South Dakota packers would not be able to purchase livestock at livestock auction markets in other states without complying with [the South Dakota pricing statute] . . . . Livestock producers in foreign states would be deprived of market choices when dealing with South Dakota packers.

Id. South Dakota's price discrimination statute violated the dormant Commerce Clause because it necessarily required out-of-state commerce to be conducted according to South Dakota terms.

The Missouri statute, on the other hand, only regulates the sale of livestock sold in Missouri. If enacted, it may have the effect of increasing the price that packers pay and producers receive for livestock fed in Missouri, but the extraterritorial reach that the district court found in the South Dakota statute does not exist in the application of the Missouri statute.

Furthermore, in Cotto Waxo Co. v. Williams, 46 F.3d 790 (8th Cir. 1995), this court reviewed a Minnesota statute that proscribed the sale and distribution of a petroleum-based sweeping compound in Minnesota. The court explained that

> [t]he Act does not require Cotto Waxo to conduct its commerce according to Minnesota's terms. Clearly, the Act has affected Cotto Waxo's participation in interstate commerce. Nevertheless, the Act itself is indifferent to sales occurring out-of-state. Cotto Waxo is able to sell to out of state purchasers regardless of Cotto Waxo's relationship to Minnesota. We conclude that the Act does not suffer from an unconstitutional extraterritorial reach.

7

Id. at 794. Similarly, in this case, packers who do not wish to conduct business under the terms of § 277 may purchase their livestock for slaughter from other states. Although the statute has affected the packers' participation in commerce, the statute itself is indifferent to sales occurring out of state. Id. The appellees concede as much: "Since cattle travel from many states to be fed in Missouri, an out of state owner of cattle can easily bypass Missouri and use a feedlot in a surrounding state . . . . Similarly, a Missourian who owns cattle can easily ship that cattle to Kansas or Nebraska, or elsewhere, to be fed to slaughter weight, bypassing the Missouri feedlots." (Appellees' Br. at 4).

The appellees complain that by discouraging out-of-state packers from doing business in Missouri, the price discrimination law has a chilling effect on interstate commerce. There is no chilling effect on interstate commerce if packers can just as easily purchase Nebraska or Kansas livestock for slaughter if they do not purchase Missouri livestock. In sum, the Missouri statute does not, on its face, discriminate between in-state and out-of-state packers or producers, nor does it attempt to regulate out-of-state commerce as the unconstitutional South Dakota statute had. The statute affects the flow of interstate commerce but it does not burden interstate commerce. See Cotto Waxo, 46 F.3d at 794. For that reason we need not reach the second step of the analysis, which balances the statute's burden on interstate commerce against the statute's putative local benefits.

Even if we were to agree that § 277 does burden interstate commerce, we would still find the statute to be constitutional. In Pike, 397 U.S. at 142, the Court explained that

> [w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local

8

benefits . . . . If a legitimate local interest is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

The state of Missouri presents several legitimate justifications for passing the price discrimination statute. It asserts that the statute, if enacted, would preserve the family farm and Missouri's rural economy by preventing packers' discriminatory treatment among different classes of producers.[3] The state also believes that the statute will improve the quality of Missouri livestock, to the benefit of producers. According to a witness for the state, as packers make their purchases on the basis of quality through the grade and yield method, producers will make better genetic decisions, raise better quality animals, and earn a better price for their livestock, potentially resulting in a greater demand for meat. (Hr'g Tr. Vol. II, pp. 288-91, testimony of Kyle Vickers).

To satisfy their burden of showing that the statute's burden on interstate commerce outweighs the alleged local benefits, the appellees assert that § 277 will have a devastating effect on out-of-state packers and producers. Citing testimony presented below, they contend that the statute will discourage out-of-state livestock owners from sending their cattle to Missouri to be fed and sold, dictate the method by which out-of-state packers can purchase Missouri livestock, and eliminate producers' ability to sell their livestock at a premium. It should be noted, however, that packers and producers potentially affected by § 277 are not parties to this lawsuit. The district court erroneously relied on hearsay testimony regarding the packers' and producers'

---

[3]Under the current system, larger producers receive premiums for their livestock, giving them an economic advantage over smaller farmers.

economic concerns, presented by the appellees' witnesses, in finding that § 277 is an unconstitutional burden on interstate commerce.[4]

The Missouri legislature has the authority to determine the course of its farming economy, and this measure is a constitutional means of doing so. We have no doubt that the state considered the potential harms and benefits to all stakeholders in creating its price discrimination law. In the event that the implemented statute adversely affects Missouri farms or consumers, appellees are free to petition the legislature to amend or repeal the statute. Appellees have asked us to strike Missouri's statute because it burdens interstate commerce, but they have failed to show how the measure has this unconstitutional effect. Economic hardship experienced by Missouri feedlots does not rise to the level of a dormant Commerce Clause violation.

One other issue that was discussed at trial merits brief mention here. Federal law already prohibits price discrimination in the sale of livestock. The Packers and Stockyards Act of 1921 provides, in part, that:

---

[4]For example, attorney for appellees asked witness "[d]id you learn, sir, from anyone what the packer that you sell to, IBP, would do if the price discrimination law went into effect?" Over the state's objection, the district court allowed the witness to respond, "[y]es . . . the head buyer for IBP . . . told me that . . . we would be selling cattle on a grade and yield basis only, that's the only way they were going to buy cattle when this [bill] went into effect." (Hr'g Tr., Vol. I, pp. 151-52). Attorney for appellees asked the same witness what other packers would do if the law was implemented. Again, over the state's objection, the district court allowed the witness to respond, "National Beef was just going to quit buying cattle in Missouri . . . . And Omaha wasn't sure what they were going to do. They would certainly be grade and yield, and they may not even buy cattle anymore." (Hr'g Tr., Vol. I, p. 152).

It shall be unlawful for any packer with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:

(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or

(b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect.

7 U.S.C. § 192. It is certainly within the purview of the Missouri legislature to regulate the manner in which livestock is sold within its borders when federal law supports such legislation.

III. Conclusion

The district court incorrectly determined that the statute violated the dormant Commerce Clause and erred in striking the statute. For the reasons cited above, we reverse.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

11